STATE of Minnesota, Appellant,

v.

Steven Leonard BOYD, Respondent.

No. C2–82–1624.

Supreme Court of Minnesota.

April 1, 1983.

Hubert H. Humphrey III, Atty. Gen., St. Paul, Arvid Wendland, County Atty., Blue Earth, for appellant.

C. Paul Jones, Public Defender, and Robert D. Goodell, Asst. Public Defender, Minneapolis, for respondent.

AMDAHL, Chief Justice.

This is a pretrial appeal by the state, pursuant to Minn.R.Crim. 29.03, from an order of the district court granting a defense motion to limit (and in effect suppress) the testimony of an expert witness for the state in its prosecution of defendant for criminal sexual conduct in the third degree, Minn.Stat. § 609.344(b) (1982).[1] The testimony, which the state wants to use to prove that defendant sexually penetrated the victim, is that the complainant has given birth to a child after the alleged act of penetration and that blood test results indicate that defendant is the father of the child.

In May of 1981 defendant gave birth to a baby. Subsequently she stated that she had had sexual intercourse with defendant two to three times a week over a 2-year period, ending sometime prior to December of 1980.

On January 15, 1982, the present charge was filed against defendant.

Defendant thereafter voluntarily gave a sample of his blood for comparative analysis with the blood of the complainant and the

---

1. This subsection is addressed to sexual penetration of a person who is at least 13 but less than 16 years of age by a person who is more than 24 months older.

blood of her baby at the War Memorial Blood Bank.

Comparing the blood types of the three with respect to 15 different gene systems, Dr. H.F. Polesky, M.D., who is director of the Blood Bank, came to the following conclusions: (a) that use of the 15 genetic systems will provide evidence of nonpaternity in 94% to 97% of the cases in which the man in fact is not the father of the child, and that in this case the results do not provide evidence of nonpaternity; (b) that 1,121 unrelated men would have to be randomly selected from the general population of men before another man would be found with all the appropriate genes to have fathered the child in question; and (c) that the index (1121.39) can be converted to a percent (99.911%) to determine the likelihood that defendant in fact is the father of the child.

On June 30, 1982, Dr. Polesky's deposition was taken. At that time he elaborated on and explained the test results. Asked a hypothetical question, which included the assumption that complainant would testify that she had had sexual intercourse with defendant and not with any first-degree relative of his and the assumption that defendant is fertile, he expressed the opinion that defendant was the father of the child in question.

Shortly before trial was to begin, defense counsel moved for an order limiting the expert testimony on two grounds: first, that the expected testimony was inadmissible evidence of statistical probability; second, that Dr. Polesky's opinion would be based on an assumption that defendant had sexually penetrated the complainant, and yet whether defendant had sexually penetrated the complainant was the ultimate issue in the case. The trial court granted defendant's motion.

This appeal followed.

There are a number of cases in other jurisdictions dealing with the admission of evidence of subsequent pregnancy to establish that the crime occurred (in the context of statutory rape) or that penetration occurred (in the context of nonstatutory rape). See, e.g., Hall v. State, 378 So.2d 1193 (Ala.Cr.App.1979), cert. denied, 378 So.2d 1196 (Ala.1980). However, the general view expressed in these cases is that the evidence may not be admitted to prove identity, that is, that it was the defendant who committed the act of penetration.

None of these cases confronts the issue of admission of evidence of the sort in this case. That is because the scientific advances which have made possible the sort of testimony used in this case are relatively recent. See State on Behalf of Kremin v. Graham, 318 N.W.2d 853 (Minn.1982), Hepfel v. Bashaw, 279 N.W.2d 342 (Minn.1979), and State, on Behalf of Ortloff v. Hanson, 277 N.W.2d 205 (Minn.1979), all dealing with the use of blood tests to establish paternity in paternity suits.

In dealing with the issue, we prefer to start with the elementary proposition that an act of sexual penetration is a physical act and the related proposition that a man who commits such an act often leaves behind physical evidence connecting him to the act.

There are numerous examples of such evidence:

(a) If a man having venereal disease sexually penetrates a woman and she contracts the same disease, that fact, assuming proper foundation, is evidence tending to establish that the man sexually penetrated the woman. See State v. Mason, 152 Minn. 306, 310, 189 N.W. 452, 453 (1922).

(b) Science has devised ways of testing semen and determining some of the blood types of the source. This sort of testing can show that the defendant could have been the source of the semen (or that he could not have been the source). See A. Moenssens, R. Moses and F. Inbau, Scientific Evidence in Criminal Cases, §§ 6.16, 6.19 (1973).

(c) Similarly, if the rapist cuts himself and leaves blood at the scene, the blood can be analyzed and compared with that of the suspect and he can either be included or excluded as a possible source.

(d) The same can be said of pubic hairs left by the rapist or fibers or footprints or fingerprints.

In this case we are dealing with a form of physical evidence left by the rapist.

In ruling that the evidence was inadmissible, the trial court alluded to cases dealing with admission of statistical probability evidence in criminal cases. The leading such case in Minnesota is *State v. Carlson,* 267 N.W.2d 170 (Minn.1978), where we held that it was error (although nonprejudicial) to admit expert testimony expressing the results of microscopic hair comparison in terms of statistical probabilities. Specifically, the expert testified in that case that based on his studies there was a 1-in-800 chance that the foreign pubic hairs found on the victim were not defendant's hairs and a 1-in-4,500 chance that head hairs found clutched in the victim's hand were not defendant's hairs. The issue was whether it was error to express the similarities in statistical terms. Holding that it was, we stated:

> Our concern over this evidence is not with the adequacy of its foundation, but rather with its potentially exaggerated impact on the trier of fact. Testimony expressing opinions or conclusions in terms of statistical probabilities can make the uncertain seem all but proven, and suggest, by quantification, satisfaction of the requirement that guilt be established "beyond a reasonable doubt." See, Tribe, *Trial by Mathematics,* 84 Harv.L.Rev. 1329. Diligent cross-examination may in some cases minimize statistical manipulation and confine the scope of probability testimony. We are not convinced, however, that such rebuttal would dispel the psychological impact of the suggestion of mathematical precision, and we share the concern for "the substantial unfairness to a defendant which may result from ill conceived techniques with which the trier of fact is not technically equipped to cope." *People v. Collins,* 68 Cal.2d [319], 332, 66 Cal.Rptr. [497], 505, 438 P.2d [33], 41.

For these reasons, we believe [that the witness'] testimony that there was only a 1-in-800 chance that the foreign pubic hairs found on the victim did not come from the accused and even more remote 1-in-4,500 chance that the head hairs did not belong to the accused was improperly received. [Another witness'] testimony concerning microscopic hair comparison analysis, however, was properly admitted. In light of [that witness'] testimony, we regard [the statistical evidence] as cumulative and thus nonprejudicial on the facts of this case.

267 N.W.2d at 176.

Professor Tribe admits in his article that statistics can be of aid in dealing with matters that are objectively verifiable in the world outside the courtroom, like identification or what happened, but he states that statistics are of less use with respect to issues, such as intent, that correspond to no objectively verifiable fact outside the verdict of the jury. He recognizes that, subject to careful instruction, there may be occasions when the jury should be informed of the underlying statistical evidence. Thus, he states in dealing with hand-print evidence:

> By itself, of course, the "one-in-a-thousand" statistic is not a very meaningful one. It does not * * * measure the probability of the defendant's innocence—although many jurors would be hard-pressed to understand why not. * * * [E]ven if there were as few as one hundred thousand potential suspects, one would expect approximately one hundred persons to have such prints; if there were a million potential suspects, one would expect to find a thousand or so similar prints. Thus the palm print would hardly pinpoint the defendant in any unique way.

> To be sure, the finding of so relatively rare a print which matches the defendant's is an event of significant probative value, an event of which the jury should almost certainly be informed. Yet the *numerical index* of the print's rarity, as measured by the frequency of its random occurrence, may be more misleading than

enlightening, and the jury should be informed of that frequency—if at all—only if it is also given a careful explanation that there might well be many other individuals with similar prints. The jury should thus be made to understand that the frequency figure does not in any sense measure the probability of the defendant's innocence.

84 Harv.L.Rev. at 1355.

Professor Tribe's main point is not that it is necessarily wrong to inform the jury of the underlying statistical evidence but that there is a real danger that the jury will use the evidence as a measure of the probability of the defendant's guilt or innocence, and that the evidence will thereby undermine the presumption of innocence, erode the values served by the reasonable doubt standard, and dehumanize our system of justice.

It does not follow from either the *Carlson* case or Professor Tribe's article that the correct approach is to suppress the evidence entirely, as the trial court did. We believe that the trial court may appropriately limit Dr. Polesky's testimony so as to omit reference to the degree of probability that defendant is the father of the child and to omit reference to the number of unrelated men one would have to randomly test before one would find another man who could have been the father of the child. On the other hand, Dr. Polesky should be permitted to testify as to the basic theory underlying blood testing and should be permitted to testify that not one of the 15 tests excluded defendant as the father of the complainant's baby. We believe that his hypothetical opinion should be limited to the following: that the scientific evidence in the form of the test results is consistent with the view that defendant is the father of the baby.

Remanded for trial.