**STATE of Minnesota, Appellant,**

v.

**JOON KYU KIM, Respondent.**

No. C4-85-828.

Supreme Court of Minnesota.

Jan. 2, 1987.

Steven C. DeCoster, Asst. Co. Atty., Hubert H. Humphrey, III, Atty. Gen., St. Paul, for appellant.

Douglas W. Thomson, Deborah Ellis, St. Paul, for respondent.

William P. Kennedy, Chief Henn. County Pub. Defender, David Knuston, 1st Asst., Philip D. Dust, Asst., David Warg, MN Trial Lawyers Assoc., Minneapolis, Hubert H. Humphrey, III, Atty. Gen., Paul P. Kempainen, Asst., St. Paul, C. Paul Jones, State Public Defender, Kathy King, Mark

F. Anderson, Assts., Minneapolis, for amicus curiae.

WAHL, Justice.

This appeal questions the standard that governs state appeals of pretrial orders in criminal prosecutions as well as the propriety of the trial court ruling in this case. Joon Kyu Kim is charged with accomplishing sexual penetration by use of force or coercion in violation of Minn.Stat. §§ 609.-344(c) and 609.345(c) (1984). At a pretrial hearing, the state proferred scientific evidence in the form of blood test results linking Kim to semen found at the scene of the alleged rape and a statistical analysis of the frequency with which Kim's blood type occurred in the local male population. The trial court ruled that the blood test results and expert testimony that the test results were consistent with Kim having been the source of the semen could be admitted at trial, but ruled that the statistical population frequency evidence was to be excluded. The state appealed the portion of the order suppressing evidence and Kim cross-appealed the portion of the order admitting evidence. The court of appeals held that the state failed to clearly establish that the trial court erred and that the suppression of the evidence would have a critical impact on the trial. The court of appeals declined to review the cross-appeal on the ground that Kim had an adequate remedy in a direct appeal of his conviction. *State v. Kim*, 374 N.W.2d 814, 816 (Minn. Ct.App.1985).

The state alone has sought further review of the decision of the court of appeals. The Minnesota Attorney General has, with our permission, raised the issue of the appropriate standard for permitting pretrial state appeals in criminal prosecutions. We affirm the decision of the court of appeals.

The facts in this case, as derived from police reports, indicate the complainant reported to police that on December 10, 1984, Joon Kyu Kim, her employer, had forcible, nonconsensual sexual intercourse with her.

The complainant and her husband were employed as managers of a St. Paul apartment complex owned by Kim. On the evening of December 10, 1984, the complainant told police she was home alone. She and her husband had quarreled earlier in the evening and he had left the apartment. Her husband told police that after he left the apartment, he went to talk with Kim and they discussed, among other things, his marital problems. About 10 p.m., the complainant reported, Kim showed up at her apartment and began to talk about her marital relationship, telling her she wasn't having enough sex with her husband and that he would show her how. She said Kim then grabbed her breast, but she pulled away and told him to leave. Kim grabbed her again, she told police, forced her into the bedroom and onto the bed. She said she felt very afraid. He removed his clothing and her clothing and then climbed on top of her, she stated, sucking on her breasts and penetrating her vagina with his penis until he ejaculated. She said that as he left, Kim gave her a twenty dollar bill and told her next time it would be thirty dollars. He also told her she wouldn't call the police because she "needed the job too much." The complainant contacted the police shortly after Kim left the apartment.

At the time the complainant reported the incident, she turned over to police the sheet from the bed where she alleged she had been raped, a pair of panties she was wearing, a sanitary pad, a towel she had used to clean herself, and the twenty dollar bill she alleged Kim had given her. At the hospital, swab samples were taken of fluid present in the complainant's vagina. The Bureau of Criminal Apprehension Laboratory (BCA) found semen present on the bed sheet and on the vaginal swabs.

Kim was questioned by police the next day and denied having had sexual intercourse, consensual or nonconsensual, with the complainant. He admitted he had gone to her apartment that night, but stated he went there to fire her from her job as caretaker. He claimed her accusation was motivated by this firing. He pleaded not

guilty to the criminal sexual conduct charges subsequently filed against him.

The trial court, on the state's motion, ordered samples of Kim's blood, saliva and hair taken for purposes of comparing his blood type with the semen found on the bed sheet and in the complainant's body.[1] Comparison samples of blood were also taken from the complainant and from her husband. The samples were tested at the BCA Lab using blood type testing (ABO system) and electrophoresis testing, a procedure that identifies distinctive enzymatic genetic markers present in the blood and bodily fluids. The tests were repeated at the Minneapolis War Memorial Blood Bank and the BCA results were replicated. The BCA Lab analyst was prepared to offer testimony that the semen found in the complainant's body and on the bed sheet was consistent with Kim's blood type and PGM reading.[2] Further, the analyst was prepared to testify that 96.4 percent of males in the Twin Cities metropolitan population, but not Kim, could be excluded on the basis of this combination of blood factors as possible sources of the semen found on the bed sheet.

Kim objected to all of the scientific evidence at the pretrial hearing. As to the statistical population frequency evidence, he argued that its prejudicial impact outweighed its probative value. The trial court excluded the statistical population frequency evidence under the rule of *State v. Boyd*, 331 N.W.2d 480 (Minn.1983). This pretrial appeal followed.

■ 1. The standard governing our review of this case is that set out in *State v. Webber*, 262 N.W.2d 157 (Minn.1977). This court will, in a pretrial appeal, reverse the determination of the trial court only if the state demonstrates clearly and unequivocally, first, that the trial court erred in its judgment and, second, that unless reversed, the error will have a critical impact on the outcome of the trial. *Id.* at 159.

Under the *Webber* standard, we consider first whether the state met its burden of clearly establishing that the trial court's suppression order was erroneous. The court of appeals held that the state did not meet this burden and concluded that the trial court had properly interpreted and applied the rule of our decision in *Boyd, supra,* to suppress the statistical population frequency evidence. *Kim,* 374 N.W.2d at 816. The defendant in *Boyd* was prosecuted for criminal sexual conduct in the third degree, Minn.Stat. § 609.344(b) (1982), for having sexual intercourse with a 14–year–old girl, who became pregnant and gave birth as a result. We held that expert testimony that there was a 99.911 percent likelihood of paternity, based on population frequency statistics applied to interpret blood test results, must be excluded. "[T]here is a real danger," we stated, "that the jury will use the [statistical population frequency] evidence as a measure of the probability of the defendant's guilt or innocence, and that the evidence will thereby undermine the presumption of innocence, erode the values served by the reasonable doubt standard, and dehumanize our system of justice." *Id.* at 483.[3]

The state argues in this appeal that the statistical evidence it seeks to introduce against Kim can be distinguished from that we disapproved in *Boyd.* The difference between the evidence in *Boyd* —that 99.911 percent of the population, but not the defendant, could be excluded as donors—and the evidence it has proferred in this case— that 3.6 percent of the population, including

1. The majority of people, including Kim, secrete their blood type in their body fluids, including semen, saliva, etc.

2. PGM is an enzyme. It is a genetic marker that may be detected in the blood by use of the electrophoresis testing process.

3. *Boyd* was preceded by *State v. Carlson,* 267 N.W.2d 170 (Minn.1978) where we found it was

error to admit expert testimony that there was a 1–800 chance that pubic hairs found on the victim were not those of the defendant and a 1–4,500 chance that head hairs found clutched in the victim's hand were not those of the defendant. *Id.* at 176. Because the testimony was found to be merely cumulative evidence, we held the error was nonprejudicial. *Id.*

the defendant, are possible donors—is the difference between inclusion and exclusion. The state contends that when statistics are stated as an exclusion figure, as in *Boyd,* the risk is greater that the jury will interpret the statistical percentage as a statement of the probability of the defendant's guilt. By contrast, when stated as an inclusion figure, the danger of such quantification is urged to be less.[4]

■ The court of appeals correctly rejected this purported distinction, stating that *Boyd* "do[es] not focus on the nature of the statistics but rather on the impact of the statistics on the trier of fact." *Kim,* 374 N.W.2d at 816. The danger we recognized in Boyd is that statistics on the frequency with which certain blood type combinations occur in a population will be understood by the jury to be a quantification of the likelihood that the defendant, who shares that unique combination of blood characteristics, is guilty. This danger exists as much in an inclusion as in an exclusion figure because, as the trial court noted, faced with an exclusion percentage, a jury will naturally convert it into an inclusion percentage.[5] Because we cannot meaningfully distinguish the evidence offered in *Boyd* from that in the case now before us, we conclude that *Boyd* controls. We affirm the decision of the court of appeals and hold that the state has not clearly and unequivocally shown that the trial court order suppressing statistical population frequency evidence was erroneous.

4. The state's inclusion-exclusion argument is somewhat confused in that the state has differently characterized the statistical evidence it seeks to introduce at different times. In first discussing the evidence before the trial court, the state argued in terms of an exclusion figure, *i.e.,* that there would be testimony that 96.4 percent of the population could be excluded as possible sources of the semen. In briefs submitted in this appeal, the state characterizes the evidence in terms of an inclusion figure, *i.e.,* that there would be testimony that 3.6 percent of the population could be included as possible sources.

5. The trial court used the following apt, if homely, illustration of this point. If a weather report

The state next argues that if its proferred evidence cannot be distinguished from the evidence we disapproved in *Boyd,* we should modify or overrule *Boyd* but has presented no new or compelling argument. The state argues that the effect of *Boyd* is to exclude from the factfinding process reliable scientific evidence with great probative evidentiary value. The probative value of such evidence is, however, not of controlling significance in the analysis we adopted in *Boyd.* Under the Minnesota Rules of Evidence, relevant evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice. Minn.R.Evid. 403. In *Boyd,* we clearly determined that the danger of population frequency statistics used to analyze blood test results unfairly prejudicing a defendant due to its "potentially exaggerated impact on the trier of fact" outweighed any probative value. *Boyd,* 331 N.W.2d at 482 (citation omitted).

■ *Boyd* does not foreclose the use of expert interpretations of blood test results.[6] As we stated in *Boyd,* Professor Lawrence Tribe—on whom we in part relied[7]—recognizes that, "subject to careful instruction, there may be occasions when the jury should be informed of the underlying statistical evidence." 331 N.W.2d at 482. We also stated:

It does not follow from either the *Carlson* case or Professor Tribe's article that the correct approach is to suppress the evidence entirely, as the trial court did. We believe that the trial court may

predicts there is a 90 percent chance of sun, most of us will deduce that there is a ten percent chance of rain.

6. The concern about the prejudicial effect of blood test evidence expressed in *Boyd* does not apply outside of the context of criminal prosecutions. Blood test results and expert explanations thereof are admissible in evidence, for example, in a paternity proceeding. *See, e.g., State ex rel. Kremin v. Graham,* 318 N.W.2d 853 (Minn.1982); *Hennepin County Welfare Bd. v. Ayers,* 304 N.W.2d 879 (Minn.1981).

7. Tribe, *Trial by Mathematics,* 84 Harv.L.Rev. 1329, 1355 (1971).

appropriately limit [the expert's] testimony so as to omit reference to the degree of probability that defendant is the father of the child and to omit reference to the number of unrelated men one would have to randomly test before one would find another man who could have been the father of the child. On the other hand, [the expert] should be permitted to testify as to the basic theory underlying blood testing and should be permitted to testify that not one of the 15 tests excluded defendant as the father of the complainant's baby. We believe that his hypothetical opinion should be limited to the following: that the scientific evidence in the form of the test results is consistent with the view that defendant is the father of the baby.

331 N.W.2d at 483. As in *Boyd*, the expert called by the state in this case should not be permitted to express an opinion as to the probability that the semen is Kim's and should not be permitted to get around this by expressing the opinion in terms of the percentage of men in the general population with the same frequency of *combinations* of blood types. The expert should be permitted to testify, however, as to the basic theory underlying blood testing, to testify that not one of the individual tests excluded Kim as a source of the semen and to give the percentage of people in the general population with each of the *individual* blood types, and to express an opinion that scientific evidence is consistent with Kim having been the source of the semen.

2. Our holding that the trial court's suppression ruling was not erroneous necessarily implies that the state has not, in this case, met the standard for a pretrial appeal. Consequently, our analysis need not reach the issue of whether the state satisfied the so-called critical impact prong of the *Webber* test.

We have, however, permitted the Attorney General of the State of Minnesota, amicus curiae, to raise the issue of whether we should overrule the *Webber* standard. We have also allowed the Office of the Minnesota Public Defender, the Office of the Hennepin County Public Defender, and the Minnesota Trial Lawyers' Association, as well as the parties to this appeal, to file briefs on this issue. In light of the briefs submitted, the extensive research reflected therein, and the importance of the issue, we will take this opportunity to review critical impact prong of the *Webber* standard.

It is instructive to consider the roots from which the *Webber* standard derives. The common law rule is that, absent statutory authority, the state has no right of appeal in a criminal case. *See United States v. Sanges*, 144 U.S. 310, 315, 12 S.Ct. 609, 610, 36 L.Ed. 445 (1892). This rule was described by the United States Supreme Court as being "founded in the humanity of the law, and in a jealous watchfulness over the rights of the citizen, when brought in unequal contest with the State." *Id.* (emphasis omitted). In Minnesota, the legislature first departed from this longstanding rule in 1967 when it enacted Minn.Stat. § 632.11 (1967) authorizing state appeal of certain pretrial orders. A companion statute, Minn.Stat. § 632.12 (1967), required that an appeal by the state of a suppression order be accompanied by a statement:

> asserting that the deprivation of the use of * * * a confession or admission ordered to be suppressed has rendered the proof available to the state with respect to the criminal charge filed by the court, (1) insufficient as a matter of law, or (2) so weak in its entirety that any possibility of prosecuting such charge to a conviction has been effectively destroyed.

*Id.* In 1975, this court promulgated the Minnesota Rules of Criminal Procedure, including Rule 29.03, subd. 1 (now Minn.R. Crim.P. 28.04, subd. 1), which provided that the state may appeal as of right any pretrial order issued in a felony case.[8] The

---

8. The effect of the implementation of the Rules of Criminal Procedure was to supersede sec-

tions 632.11 and 632.12. The statutes were re-

rule omits any requirement that the state must show impact before the appeal is allowed. In 1977, however, this court reinstated limitations on state appeals in *Webber, supra,* recognizing the necessity of preserving "a meaningful standard against which to measure the degree of harm to the state that will result from the suppression of evidence ordered after an Omnibus Hearing." 262 N.W.2d at 159.

The heart of the argument of the state and the Attorney General is a claim that the critical impact prong of the *Webber* standard has gravely harmed the state's ability to effectively prosecute criminal cases. The Attorney General asserts it has been virtually impossible to prove that suppressed evidence will have a critical impact on the trial outcome. He charges that the critical impact standard has been interpreted narrowly by our state appellate courts to require proof that without the suppressed evidence, charges would be dismissed or the remaining evidence would be insufficient as a matter of law. This interpretation ignores, in the state's view, the prosecution's heavy burden of persuading the jury beyond a reasonable doubt. The Attorney General fears as well that the proper development and harmonization of the criminal law has been hindered by the critical impact rule because many erroneous trial court rulings and significant issues never reach appellate court consideration.

While we disagree with the view of the state that the critical impact test has virtually foreclosed pretrial appeals by the state, we believe that clarification of the test is in order. In a number of its opinions the court of appeals has stated that "[t]here is no Minnesota Supreme Court case where the state has proved the 'critical impact' strand of the *Webber* test." *See, e.g., State v. Lee,* 376 N.W.2d 259, 261–62 (Minn.Ct.App.1985). The fact is that before the establishment of the court of appeals, we frequently reviewed state's appeals from pretrial suppression orders and in reviewing such cases we made a preliminary determination that the state had met the critical impact test.[9] Had we not made such a preliminary determination, we would not have decided those appeals but would have dismissed them.[10]

The court of appeals has also stated, in several cases, that in order to show critical impact the state must show that the remaining evidence is "so weak that all possibility of conviction has been destroyed"— *see, e.g., Lee,* 376 N.W.2d at 262—or that the absence of the evidence "will * * * cause the State's case to collapse"—*see, e.g., State v. Pelovsky,* 347 N.W.2d 529, 531 (Minn.Ct.App.1984). These formulations of the rule are derived not from our cases but from the repealed statute, namely, the statutory requirement that the evidence suppressed has rendered the available proof insufficient as a matter of law or so weak

pealed in 1979. Act of May 29, 1979, ch. 233, § 42, 1979 Laws of Minnesota 485, 500.

Under the Rules, the defendant has no pretrial appeal as of right. If the state seeks a pretrial appeal, the trial court may, at its discretion, permit a cross-appeal by the defendant. Minn.R.Crim.P. 28.04, subd. 3.

**9.** *See e.g., State v. Rodewald,* 376 N.W.2d 416 (Minn.1985); *State v. Lepley,* 343 N.W.2d 41 (Minn.1984); *State v. Kvam,* 336 N.W.2d 525 (Minn.1983); *State v. Patricelli,* 324 N.W.2d 351 (Minn.1982); *State v. Frazier,* 318 N.W.2d 42 (Minn.1982); *State v. Gonzales,* 314 N.W.2d 825 (Minn.1982); *State v. Ludtke,* 306 N.W.2d 111 (Minn.1981); *State v. Veigel,* 304 N.W.2d 900 (Minn.1981); *State v. Kochendorfer,* 304 N.W.2d 336 (Minn.1981); *State v. Dineen,* 296 N.W.2d 421 (Minn.1980); *State v. Aguirre,* 295 N.W.2d 79 (Minn.1980); *State v. Vohnoutka,* 292

N.W.2d 756 (Minn.1980); *State v. Hall,* 292 N.W.2d 749 (Minn.1980); *State v. Armstrong,* 291 N.W.2d 918 (Minn.1980); *State v. Potter,* 288 N.W.2d 713 (Minn.1980); *State v. Gallahue,* 273 N.W.2d 660 (Minn.1978); *State v. Siegfried,* 274 N.W.2d 113 (Minn.1978); *State v. Martinez,* 270 N.W.2d 121 (Minn.1978).

**10.** Counsel for the state expressed concern that when critical impact is used as a threshold requirement to review, the state has no forum in which to litigate the critical impact issue. In petitioning for review, we trust that the state is giving the court its assurance that it believes critical impact can be demonstrated. We would suggest, however, that it would be useful for the state to ensure that in each petition for pretrial appeal, the facts alleged to demonstrate critical impact be set forth in some detail.

as to effectively destroy the possibility of prosecuting the charge to a conviction. *See* Minn.Stat. § 632.12 (1967) (repealed 1979). *Webber* itself, while speaking approvingly of the statutory language, adopted a rule that included, not the statutory language, but a requirement that the unreversed error "will have a critical impact on the outcome of the trial." *Webber*, 262 N.W.2d at 159.

In practice we have never required the showing required under the repealed statute. Critical impact has been shown not only in those cases where the lack of the suppressed evidence completely destroys the state's case, but also in those cases where the lack of the suppressed evidence significantly reduces the likelihood of a successful prosecution. For example, in *State v. Lynard*, 294 N.W.2d 322 (Minn. 1980), the issue was whether the trial court had erred in suppressing certain other-crime evidence that the state wanted to use at trial to rebut the defense of entrapment to a series of charges arising from the defendant's selling stolen property to an undercover agent. Even without the suppressed evidence, the state still would have had the testimony of the undercover officer, recordings made of the transactions, and possibly the testimony of co-defendants who had pleaded guilty and apparently were willing to testify against the defendant. We addressed the suppression issue on the merits and remanded for consideration of the suppression order during the trial. *Id.* at 323; *see also State v. Marhoun*, 323 N.W.2d 729 (Minn.1982).

The *Webber* critical impact rule as we have applied it is consistent with the standard proposed by the A.B.A. Standards for Criminal Justice. *See* IV ABA Standards for Criminal Justice, Criminal Appeals 21–1.4(a)(iii) (2d ed. 1980). Under the ABA standard, the prosecution may appeal before trial from a suppression order only "where the effect is to seriously impede, although not to completely foreclose, con-tinuation of the prosecution." *Id.* In the almost 10 years since we adopted *Webber*, we are persuaded that the standard of that case has provided a fair and workable rule by which to govern pretrial state appeals.

Affirmed.

The defendant is awarded $400 in attorney fees pursuant to Minn.R.Crim.P. 28.04, subd. 2(6).

KELLEY, J., dissents.

KELLEY, Justice (dissenting):

With utmost reluctance, I respectfully dissent. If our cases of *State v. Carlson*, 267 N.W.2d 170 (Minn.1978) and *State v. Boyd*, 331 N.W.2d 480 (Minn.1983) were correctly decided, without question stare decisis dictates the result here reached by the majority. *Carlson* is less than nine years old and *Boyd* is slightly over three. Both decisions were decided by a unanimous court. Normally, desired stability in the law is seldom enhanced by calling into question the correctness of precedents. Especially is that true when the questioned precedents are of such recent vintage.[1] My reluctance to pen this dissent is prompted not only by that laudatory and necessary stare decisis consideration, but additionally because I joined with the remainder of the court in *State v. Boyd*. However, no violence is done to that laudatory and venerable doctrine of stare decisis when we re-examine a ruling that appears to be clearly wrong; nor is any valid public purpose promoted by embedding in our body of law an incorrect or outmoded decision. Further study and consideration of the issues in those two cases convinces me that both were wrongly decided.

This court in both *State v. Carlson* and *State v. Boyd*, and the majority in the instant case, relied upon an article written by Professor Tribe entitled *Trial by Mathematics*, 84 Harv.L.Rev. 1329 (1971). In my opinion, the conclusions reached by Professor Tribe in that article in 1971 have since

1. *See, e.g., Smith v. Allwright*, 321 U.S. 649, 669, 64 S.Ct. 757, 768, 88 L.Ed. 987 (1944) (Roberts, J., dissenting); *Cochran v. Keeton*, 287 Ala. 439, 252 So.2d 313, 318–19 (1971) (Lawson, J., dissenting).

been successfully challenged by other researchers. *See, e.g.,* Stripinis, *Probability Theory and Circumstantial Evidence: Implications From a Mathematical Analysis,* 22 Jurimetrics J. 59, 75–78 (1981); *see also* Saks and Kidd, *Human Information Processing and Adjudication: Trial by Heuristics,* 15 Law & Soc'y 123, 124 (1980–1981). Moreover, the assumptions upon which Tribe based his conclusions, in my opinion, have been fairly rebutted by other writers. *See, e.g.,* Saks and Kidd, *supra* at 124–26, 145–51.

In a criminal case, we are concerned that no conviction shall be upheld unless guilt has been established beyond a reasonable doubt. In any system of criminal justice, a convicted person will necessarily be convicted on something less than absolute proof. Indeed, because in almost every case some doubt does exist, the law uses the expression "beyond a reasonable doubt" instead of "beyond any doubt." Thus, jurors routinely use probabilities in assessing whether the state has met its evidentiary burden. As demonstrated by Stripinis, "[i]f the probability of the accused being innocent is one in one trillion, then most people [jurors] would agree that he is 'guilty beyond a reasonable doubt.'" Stripinis, *supra,* at 76. Thus, he points out the truism that the determination is a quantifiable solution, and that not all jurors will agree on what quantity of doubt constitutes a "reasonable doubt." The question is whether it is preferable to submit to the jury properly established scientific and mathematical probabilities of the existence of a fact to bear on its decision-making process than to ignore reality by asserting people are convicted only when absolute proof is available when, in fact, absolute proof is rarely, if ever, at hand. Therefore, I conclude with Saks and Kidd that "exclusion of mathematical guides to aid a fact finder, while avoiding some problems, exposes the fact-finding process to the heuristic biases of intuitive decision making." Saks and Kidd, *supra,* at 123.

I suggest that notwithstanding a recent consideration of the issue in *State v. Carlson* and *State v. Boyd,* the time may now

have come for us to reconsider those holdings. Just a few years short of the 21st century, perhaps courts should utilize those kinds of empirical, mathematical, scientific and statistical analyses used by all sorts of professional people including those in science, industry, engineering, administration, education and planning. *See, e.g.,* E. Cleary, *McCormick on Evidence* § 210, at 651 (3d ed. 1984).

Our case of *State v. Carlson* is one of the few cases that can be found excluding computations that the court considered well-founded. We there held it was error to admit a probability "based on empirical scientific data of unquestioned validity." 267 N.W.2d 170, 176 (Minn.1978). That case is precedent for this case. We must follow *State v. Carlson* unless we feel on further reflection that it is manifestly and wrongly decided. I submit it was. Instead, I agree with the Utah court when it said in rejecting our holding in *State v. Carlson,* "[We do] not share that philosophy, having a higher opinion of the jury's ability to weigh the credibility of such figures when properly presented and challenged." *State v. Clayton,* 646 P.2d 723, 727 n. 1 (Utah 1982); *see also* E. Cleary, *McCormick on Evidence* § 210, at 655 (3d ed. 1984).

In my view the specific facts of this case demonstrate the shortcomings of excluding empirical scientific evidence. The proffered evidence involves the use of population frequency statistics in conjunction with individualization typing-test results. Based upon *Boyd,* the majority sustains the court's ruling permitting introduction of the test results but excluding the population frequency statistics. I concur with one authority in this general area when he noted:

> [I]nterpretation of individualization typing results is intimately tied to population frequency statistics; without being provided the appropriate statistical information, the triers of fact have no rational basis for deciding the significance of a type-for-type match.

Sensabaugh, *Biochemical Markers of Individuality,* in Forensic Science Handbook 338, 403 (R. Safenstein ed. 1982). Courts of other jurisdictions addressing the issue are increasingly recognizing the necessity of providing the fact finder with both the test results and the population frequency statistics. *See, e.g., Davis v. State,* 476 N.E.2d 127, 135–36 (Ind.Ct.App.1985) (noting that the approach taken by *Carlson* and *Boyd* "has been rejected by an impressive myriad of courts and commentators."); *State v. Washington,* 229 Kan. 47, 59, 622 P.2d 986, 995 (1981).

I agree. In my view, not to permit this evidence evinces on our part a distrust of both the abilities of the bar to demonstrate any weaknesses in analysis as well as our distrust of the ability of the jury to consider empirical scientific and mathematical statistical evidence with the same discrimination that it has to use, for example, in considering the *opinion* of a psychiatrist that the accused is insane.

Accordingly, even though with reluctance, I would reverse the trial court and overrule *State v. Carlson* and *State v. Boyd.*