STATE of Minnesota, Appellant,

v.

Dale James CARLIN, Respondent.

No. C8–88–488.

Court of Appeals of Minnesota.

May 24, 1988.

Hubert H. Humphrey, III, Atty. Gen., St. Paul, Alan L. Mitchell, St. Louis Co. Atty., Gary W. Bjorklund, Asst. Co. Atty., Duluth, for appellant.

C. Paul Jones, State Public Defender, Susan Maki, Asst. State Public Defender, Minneapolis, for respondent.

Robert E. Lucas, Duluth, for Ann Margaret Tjepkema.

Renee Bergeron, Asst. State Public Defender for Conflicts and Other Cases, St. Paul, for Todd Erick Sulentic.

Considered and decided by SCHUMACHER, P.J., and FOLEY and FORSBERG, JJ., without oral argument.

## OPINION

SCHUMACHER, Judge.

This is a pretrial appeal of the denial of the state's request to compel testimony of two codefendants, subject to a grant of use immunity. We affirm.

### FACTS

On November 11, 1987, Steve Barnum had been drinking in several bars in Superior, Wisconsin prior to hitchhiking across the high bridge back to Duluth. Sometime after 1:00 a.m. on November 12, Barnum recalls being picked up by four teenagers traveling in a tan 1982 Nissan Sentra. Barnum got into the back seat with one other male, and the three teenagers in the front seat were later identified as respondent Dale Carlin, Erick Sulentic and Ann Tjepkema. Barnum recalls that the fourth male in the back seat was dropped off. After stopping at a 7–Eleven store to buy

cigarettes, they drove to Chester Bowl, a ski area.

At Chester Bowl, they all got out of the vehicle and the driver pulled a six pack of beer and a golf club from the trunk. After walking about a block from the parked car, Barnum recalls that the male who had been driving swung the golf club at Barnum, striking him in the neck and forehead, and the other male hit him with a tree branch, in an attempt to rob him. When Barnum ran, the three chased him in the car, and when they caught up with him both males got out and swung at him with golf clubs. One male struck Barnum with a club and the other stabbed him in the abdomen with a knife. Barnum told police that at this point the male with the club asked, "What are we going to do?" and the one with the knife replied, "We gotta finish him off, get the job done."

As Barnum ran away, the male with the knife caught him from behind and slit his throat. Barnum then approached the nearest house and pounded on the door for help.

At approximately 2:03 a.m. on November 12, Duluth police were dispatched to 1064 Chester Park Drive in response to a report of a party attempting to break in to a house. Upon arrival, the officer found a large amount of blood on the wall of the house and found Barnum lying by the side of the house. The officer observed several lacerations on Barnum, and that Barnum appeared to be very intoxicated.

Barnum later described the male who had stabbed him as white, under six feet tall, in his twenties, 160 pounds, with a lean muscular build and short hair parted on the side. Barnum described the second male as the same age, dark complexion with longer hair, possibly taller and larger. The female was described as white, 5'7" to 5'8" tall, short blonde curly hair, slender, and approximately 18 years old.

Police interviewed several witnesses, including Ann Tjepkema, who stated she had been driving the car that picked up Barnum, and that Todd Sulentic and Dale Carlin were with her at the time. Tjepkema stated that they had dropped Barnum off in the Chester Bowl area.

Carlin, Sulentic and Tjepkema are also believed to have been involved in a robbery in Superior, which took place earlier on November 11. Jaqueline Burdick was sitting on her car outside of the Brass Rail bar when two males who fit the description of Carlin and Sulentic hit her in the head with a crow bar and grabbed her purse. The two fled in an automobile driven by a female. Burdick's checkbook was recovered from the dumpster at the 7-Eleven store in Duluth.

On December 11, 1987, Carlin was formally charged with two counts of attempted first degree murder, first and second degree assault, and aggravated robbery in connection with the events taking place in Duluth. Sulentic was charged with identical counts in juvenile court. On January 19, 1988, Sulentic was referred to adult court.

On February 16, 1988, Ann Tjepkema was charged with the same offenses as Carlin and Sulentic. Carlin's trial was scheduled for February 22, 1988, at which time the prosecution requested the court to compel Sulentic and Tjepkema to testify against Carlin pursuant to a grant of use immunity under Minn.Stat. § 609.09. The prosecutor stated that he intended to prosecute all three as charged.

The trial court denied the state's request for compelled testimony and immunity for Sulentic and Tjepkema, and the state appeals.

## ISSUE

Can the state show clearly and unequivocally that the pretrial ruling was erroneous and that the evidence excluded would have a critical impact on the trial?

## ANALYSIS

In a pretrial appeal by the prosecution, the trial court will not be reversed unless the

state demonstrates *clearly and unequivocally* that the trial court has erred in its judgment and that, unless reversed, the

error will have a *critical impact* on the outcome of the trial.

*State v. Webber,* 262 N.W.2d 157, 159 (Minn.1977) (emphasis added). Thus, the analysis involves two elements. The state must show both clear and unequivocal error and that the error would have a critical impact on the outcome of the case.

The state's burden of clearly establishing that the trial court's ruling was erroneous under the *Webber* standard was recently clarified and reaffirmed in *State v. Joon Kyu Kim,* 398 N.W.2d 544 (Minn.1987). In *Joon Kyu Kim,* the supreme court held that the state had not met its burden of establishing clearly and unequivocally that the trial court's order suppressing statistical population frequency in a rape prosecution was erroneous, when the order was consistent with a supreme court case. *Id.* at 548.

In this case, the trial court's ruling denied the state's request for use immunity for codefendants Tjepkema and Sulentic based on Minn.Stat. § 609.09, subd. 1 (1986), which provides that immunity should be granted if the trial court finds:

> that to do so would not be contrary to the public interest and would not be likely to expose the witness to prosecution in another state or in the federal courts.

The trial court denied the request based on the finding that compelling these witnesses to testify would not be in the public interest. The trial court apparently believed that a plea bargain would be in the public interest, rather than compelling witnesses to testify in the face of a constitutional privilege.[1]

Because the facts supporting the public interest finding are not specified, it is difficult to determine whether the state has met its heavy burden of showing that the finding was clearly and unequivocally erroneous. Even if the state could make this showing, however, our finding on the second element of the *Webber* analysis is determinative.

The *Webber* analysis next requires the state to show that exclusion of the evidence would have a critical impact on the state's case. To establish critical impact, the burden on the state is to show that

> the lack of suppressed evidence significantly reduces the likelihood of a successful prosecution.

*Joon Kyu Kim* at 551. The state is not required to show that its case becomes so weak that all possibility of conviction has been destroyed or that the absence of the evidence will cause the state's case to collapse. *Joon Kyu Kim* at 550–51. The state asserts that without the compelled testimony of the codefendants, the state has no direct evidence against Carlin, and that it is unlikely that it will be able to obtain a conviction. However, the state has alternative sources of evidence, such as the identification of Carlin, Sulentic and Tjepkema by the victim, and the statements made to the police by Sulentic and Tjepkema. The state could also call Brenda Rohady, who lived with Carlin's family at the time, and the other members of Carlin's household. Rohady told police that Carlin had not been home the night of the incident and that he acted strangely when hearing a news report of the stabbing. She also stated that when he did come home, Carlin had blood on his jacket. Rohady also told several of her friends that she knew Carlin had stabbed the victim because he had told his family what happened. The state could also call Paul Malzac, who stated that Tjepkema told him that Carlin was the one who stabbed the victim.

The statements of Sulentic and Tjepkema, which were tape recorded and transcribed by the police, contain detailed accounts of the incidents. These statements may be admissible hearsay as statements against penal interest. Minn.R.Evid. 804(b)(3). However, the statements may be inadmissible in the face of Carlin's sixth amendment confrontation right. *See, e.g., State v. Hansen,* 312 N.W.2d 96, 103 (Minn.1981). The trial court will have to

---

1. Minn. Const. art. I § 7 provides in part: "No person * * * shall be compelled in any criminal case to be a witness against himself * * *." This is identical to the federal constitution.

weigh the factors as set forth in *Hansen*. Regardless of whether these two statements are admitted, the other evidence implicating Carlin is substantial.

Additional circumstantial evidence strengthens the state's case. On the night of the assault, the police followed a trail of blood from Barnum to the Chester Bowl area where they found a broken golf club. Police also observed that Carlin's jacket had recently been dyed dark blue, which would be consistent with Tjepkema's statement that the blood stains had not washed out of Carlin's jacket.

The state has not shown that failure to compel the testimony significantly reduces the likelihood of a successful prosecution. We therefore hold that the denial of the state's request to compel testimony of two codefendants does not have a critical impact on the outcome of the case.

## DECISION

Affirmed.