549 So.2d 694 (1989)
Fernando MARTINEZ, Appellant,
v.
STATE of Florida, Appellee.
No. 88-1507.
District Court of Appeal of Florida, Fifth District.
August 24, 1989.
Rehearing Denied October 3, 1989.
James B. Gibson, Public Defender, and Barbara L. Condon, Asst. Public Defender, Daytona Beach, for appellant.
Robert A. Butterworth, Atty. Gen., Tallahassee, and Kellie A. Nielan, Asst. Atty. Gen., Daytona Beach, for appellee.
SHARP, Judge.
Martinez appeals from his judgment and sentences imposed after a jury trial which found him guilty of sexual battery by threat of using a deadly weapon,[1] and burglary of a dwelling with an assault.[2] He claims the trial court erred in ruling admissible statistical data to show the probability of matching Martinez's DNA configuration with DNA material recovered from clothing of the victim of the crime. Defense counsel argued that the expert's testimony was so overwhelming  one out of 234 billion  that if believed by the jury, it would establish Martinez's identity as the rapist beyond a reasonable doubt, and invade the province of the jury as the ultimate finder of facts. We disagree and affirm.
The victim in this case had retinitis pigmentosa, a condition which made her blind at night. At 2:00 a.m. she was attacked and raped in her home. The attacker severed the electrical current to the house prior to his entry, so the victim was unable to see and visually identify him. She described him as young, 5'8" tall and weighing 150 pounds. She said he had a Spanish accent. She also said the attacker's hands were not large and were soft and delicate. She also commented on his lack of facial hair.
Some of the victim's descriptive details are less than accurate as applied to Martinez. He is Hispanic, but he is 30 years old, weighs 210 pounds, is 5'10" tall, and he has a mustache. He also worked as a garbage collector, which made his hands tough and calloused.
At trial, evidence of Martinez's fingerprints on the disconnected electric meter at the victim's house was presented. Crime lab reports also established that Martinez's blood-type was consistent with the semen sample obtained from the victim and her clothing, but it was not determinative. However, the results from the DNA testing lab, Lifecodes, Inc., was almost absolute.
According to Lorah McNally,[3] a forensic scientist for Lifecodes Corporation, samples *695 of Martinez's blood and the seminal discharge found in the victim's clothing were subjected to a five-step DNA print analysis. Defense counsel extensively cross examined McNally regarding the testing process, the equipment used, and the results obtained. The testing method and process are substantially identical to those described in Andrews v. State, 533 So.2d 841 (Fla. 5th DCA 1988), rev. denied, 542 So.2d 1332 (Fla. 1989). We held such test results are sufficiently reliable, based on proven scientific principles, to be properly admitted in evidence at a criminal trial. We also held the probative value of such testimony outweighed any potential prejudicial effect on the jury.
In Andrews, the expert witness for the state also testified that the frequency with which patterns of DNA bands appear in samples taken from the general population is calculated by using an established statistical data base known as the Hardy-Weinberg equilibria. Based on that formula, Dr. Baird testified in Andrews that the chance of matching the crime sample DNA pattern with an individual in the general population other than the defendant was .0000012 percent, or one chance out of 839,914,540. However, the prejudicial effect of using such statistical data because of its conclusiveness was not specifically addressed nor challenged in Andrews.
In this case, Dr. McElfresh, the laboratory supervisor at Lifecodes[4] and McNally's supervisor, testified that the DNA from the crime semen sample and from Martinez's blood sample were taken from the same individual. Based on use of the Hardy-Weinberg equilibria, he explained the significance of the match of DNA patterns found in this case:
Q. And what would be the answer to that question as far as the likelihood of finding another individual whose bands would match-up in the same fashion as this?
A. The final number was that you would expect to find only one individual in 234 billion that would have the same banding pattern that we found in this case.
Q. What is the total earth population, if you know?
A. Five billion.
Q. This is in excess of the number of people today?
A. Yes. Basically that's what that number ultimately means is that that pattern is unique within the population of this planet.
Q. Is that consistent with your opinion earlier that the semen involved in this case came from Fernando Martinez?
A. That is correct.
Defense counsel objected on the grounds that using a figure 47 times larger than the world's current total population was "nonsensical"; and that it was so overwhelming as to deprive the jury of its function in fairly appraising all of the evidence. He cited three Minnesota cases which support the proposition that it is improper to permit an expert witness to testify as to statistical probabilities, particularly where those probabilities involve very large numbers, because it invades the province of the jury by suggesting proof beyond a reasonable doubt. See State v. Joon Kyu Kim, 398 N.W.2d 544 (Minn. 1987); State v. Boyd, 331 N.W.2d 480 (Minn. 1983); State v. Carlson, 267 N.W.2d 170 (Minn. 1978).
The Minnesota cases do not consider the adequacy of the statistical evidence's foundation. Rather, they are concerned with the potentially exaggerated impact on the jury of such absoluteness. The Minnesota *696 Supreme Court remains unconvinced that rebuttal by way of diligent cross examination will dispel the psychological impact of the suggestion of mathematical precision.[5]
We agree with Justice Kelley, who dissented in Kim. He criticized the majority opinion for its reliance on conclusions expressed in Professor Tribe's Harvard Law Review article,[6] because they have been successfully challenged and rebutted by other researchers. Furthermore, Justice Kelley agreed with the large majority of other courts who have a "higher opinion of the jury's ability to weigh the credibility of such figures when properly presented and challenged." 398 N.W.2d at 552. See also E. Cleary, McCormick on Evidence, § 210 (3d ed. 1984).
Other jurisdictions have admitted statistical evidence where it is sufficiently based on an adequate scientific and factual basis. In Commonwealth v. Gomes, 403 Mass. 258, 526 N.E.2d 1270 (1988), the Massachusetts court said:
Where courts and commentators have been reluctant to admit statistical evidence, that reluctance has stemmed largely from the fact that the probabilities on which the evidence depended were based on mere speculation or were characterized in such a way as to mislead or confuse the jury. See, e.g., Commonwealth v. Drayton, 386 Mass. 39, 50-51, 434 N.E.2d 997 (1982) (manner of presentation may make statistical evidence misleading); People v. Collins, 68 Cal.2d 319, 66 Cal. Rptr. 497, 438 P.2d 33 (1968) (en banc) (prosecution presented probabilities without any underlying factual basis); People v. Harbold, 124 Ill. App.3d 363, 381-383, 79 Ill.Dec. 830, 464 N.E.2d 734 (1984) (statistical evidence must rest on adequate factual basis and, even then, potential for confusion outweighs minimal probative value). See also Tribe, Trial by Mathematics: Precision and Ritual in the Legal Process, 84 Harv.L.Rev. 1329 (1971). Courts have legitimately feared that statistics might be employed as a way `to assign a number to the probability of guilt or innocence.' People v. Collins, supra at 330 [66 Cal. Rptr. 497, 438 P.2d 33]. On the other hand, where the statistical evidence is shown to be based on accepted scientific principles, courts, including this one, have admitted such evidence. Commonwealth v. Beausoleil, 397 Mass. 206, 217-218 n. 15, 490 N.E.2d 788 (1986) (evidence as to probability of paternity using HLA test admissible where estimate is `based on accepted scientific principles'). People v. Alzoubi, 133 Ill. App.3d 806, 809, 89 Ill.Dec. 202, 479 N.E.2d 1208 (1985) (same). Davis v. State, 476 N.E.2d 127, 134-135 (Ind. App. 1985) (`where probability testimony is based on empirical scientific data, rather than unsubstantiated estimates, the presentation and admission of probability testimony need not constitute error'). State v. Washington, 229 Kan. 47, 622 P.2d 986 (1981) (expert permitted to testify in a murder prosecution that only 0.6% of the population had same blood characteristics as defendant. (emphasis added)
Id. 526 N.E.2d at 1280.
In this state, statistical evidence relating to a defendant's probable identity from blood and semen samples has been admitted without challenge. See Andrews. In Holley v. State, 523 So.2d 688 (Fla. 1st DCA 1988) an expert witness testified the defendant was the father of the statutory *697 rape victim's child "to a high degree of probability." He later expressed this as `98.2% and higher,' based on the HLA test (human leucocyte antigen paternity blood test).
Defense counsel in this case did not attempt to challenge or refute the scientific basis for the Lifecodes DNA print analysis, nor the mathematical and factual basis for the Hardy-Weinberg equilibria formula, upon which the statistical evidence was based. We held such statistical evidence properly admitted in Andrews as sufficiently founded in scientific fact.
If we adopt Martinez's position, we will exclude statistical probability testimony where it is the most cogent, and allow it in evidence only where there remains a degree of doubt because of the inconclusiveness of the numbers. Where both are based on the same scientific methods and facts, this makes little logical sense. Indeed, it might lead to the exclusion of fingerprint evidence, which also is based on the mathematical theory of probabilities that the chance of two individuals bearing the same fingerprint (or prints) is so infinitesimally small as to be negligible. II Wigmore on Evidence, § 414 (1979).
For example, in this case, the crime lab expert witness testified that the fingerprints taken from the electrical outlet box at the victim's home were those of the defendant, Martinez. That is a 100 percent probability, although not expressed in those terms. The scientific basis for such testimony regarding fingerprints is well-established and accepted. See Annotation, Fingerprints, palm prints, or bare feet as evidence, 28 A.L.R.2d 1115 (1953).
DNA test results, like HLA test results, do not necessarily rise to the level of 100 percent probability. In order to evaluate the expert's opinion of identity based on such matches, the statistical probability of obtaining the same match from another individual is both relevant and probative to assist the jury in making its final decision.
Such statistical evidence does not remove the issue of identity from the jury's lap. The jury is free in all cases to disregard or disbelieve expert witness testimony of all kinds, as well as absolute eyewitness testimony. Defense counsel's job is to subject the expert witnesses or eyewitnesses to vigorous cross examination, as was done in this case, or attack the scientific basis upon which the statistical proofs are based. But, where statistical probability testimony is scientifically and reliably grounded, it is admissible, however high the probabilities may be.
AFFIRMED.
COBB and COWART, JJ., concur.
NOTES
[1] § 794.011(3), Fla. Stat. (1987).
[2] § 810.02(1) & (2)(a), Fla. Stat. (1987).
[3] At trial it was established that McNally has a Bachelor of Science in Biology from Cornell University, and a Master of Science in Forensic Science from C.U.N.Y. She has taken graduate courses in genetics and immunology, worked with the New York Medical Examiner's office in research on DNA, and has been trained at Lifecodes.
[4] Dr. McElfresh received a Bachelor of Science Degree from Florida International University in Miami; a Masters Degree in molecular, cellular and developmental biology at Iowa State University and a Doctorate in molecular and population genetics at the University of Georgia. In addition, he did post-doctoral studies at the University of Georgia in molecular genetics, as well as a short post-doctoral study at the University of Florida before going to work at the United States Department of Agriculture as a research geneticist. He has been employed by Lifecodes since November 1987.
[5] State v. Carlson, 267 N.W.2d 170 (Minn. 1978) (expert's testimony that there was only a 1 in 800 chance that foreign pubic hairs found on victim did not come from accused and an even more remote 1 in 4500 chance that head hairs did not belong to accused was improperly received); State v. Boyd, 331 N.W.2d 480 (Minn. 1983) (trial court should limit expert's testimony of blood analysis by omitting mention of degree of probability that defendant is father of child and omit reference to number of men one would have to randomly test before one find another possible father; rather expert is permitted to testify as to the basic theory of blood testing and testify that not 1 of 15 tests excluded accused as father of baby); State v. Joon Kyu Kim, 398 N.W.2d 544 (Minn. 1987) (trial court correct in refusing to permit expert to testify that 96.4% of males in twin cities population, but not Kim, could be excluded on basis of blood and electrophoresis testing).
[6] Tribe, Trial by Mathematics, 84 Harv.L.Rev. 1329 (1971).