**STATE of Minnesota, Appellant,**

v.

**Gary Roy LOTTON, Respondent.**

**No. C7–94–1995.**

Court of Appeals of Minnesota.

Feb. 21, 1995.

Review Denied April 18, 1995.

Hubert H. Humphrey, III, Atty. Gen., St. Paul, Michael O. Freeman, Hennepin County Atty. and J. Michael Richardson, Asst. County Atty., Minneapolis, for appellant.

Timothy R. Anderson, Frederic Bruno & Associates, Minneapolis, for respondent.

Considered and decided by DAVIES, P.J., and HUSPENI, and FOLEY, JJ.

## OPINION

FOLEY, Judge [*].

Respondent, a police officer, was charged with two controlled substance offenses and other offenses after the police searched his apartment and discovered cocaine. After a Rasmussen hearing, the trial court suppressed certain evidence, concluding that the search of respondent's apartment was a warrantless entry and that no exigent circumstances existed. The trial court also concluded that no valid consent to search the apartment was given by S.M., respondent's stepdaughter, or by Lisa, respondent's wife. Further, the trial court concluded that the state failed to meet its burden of proof that any of respondent's statements were sufficiently independent of the illegal entry to purge the taint of the warrantless home search. Because we conclude that the entry into the home was valid, and that both S.M. and Lisa gave valid consent to search, we reverse and remand for trial.

---

[*] Retired judge of the Minnesota Court of Appeals, serving by appointment pursuant to Minn. Const. art. VI, § 2.

## FACTS

Respondent was an undercover narcotics officer with the Mound Police Department and assigned to the Southwest Metro Drug Task Force. On the morning of March 10, 1994, S.M., respondent's stepdaughter, found a small plastic packet containing a white powdery substance on the bathroom floor of her family's apartment. S.M. told her 15–year–old brother M.M., who came to the bathroom, looked at the small packet, stated that he thought it was drugs, took the packet, and hid it in the living room. S.M. and M.M. discussed confronting their mother, Lisa, and respondent about the packet later that day, after they called their maternal grandmother. Before leaving for school, neither S.M. nor M.M. discussed the matter with anyone else, although both Lisa and respondent were in the apartment that morning.

That afternoon, S.M. told Cathy Jones, the chemical concerns person for the school district, about the packet. Jones called the police, and Mound police sergeant Stephen Grand came to S.M.'s school. S.M. told Grand that she had found a 1½ inch square packet with writing on it which contained white powder. Grand knew S.M. both because Grand was a friend of respondent's family and because he was the Drug Abuse Resistance Education (D.A.R.E.) instructor at S.M.'s school where S.M. had just completed the D.A.R.E. course.

Grand then told S.M. that the police would "have to intervene," and that this could be "very uncomfortable." Although Grand feared that M.M. might dispose of the evidence or otherwise confront respondent, Grand made no attempt to contact M.M. at this time. Instead, Grand contacted Mound Police Chief Len Harrell and relayed the above information.

Harrell knew that Grand was acquainted with S.M. and determined that the information that Grand had received through S.M. was very credible. The trial court noted that although Harrell and Grand both had access to telephones, neither attempted to obtain a telephone warrant at this time, nor did Harrell attempt to draft a warrant. Harrell did contact Rocky Fontana, from the Hennepin County Sheriff's Narcotics Unit, and Fontana's supervisor, Lieutenant Dunlevy. Dunlevy advised Harrell that it might take a few hours for a warrant to arrive and suggested that Harrell try to perform a consent search of respondent's residence. Harrell and Grand then drafted a consent form to be filled out by someone at the residence. Upon advice from Grand, S.M. called home and told respondent that she had missed the bus and would be coming home with Grand.

Once at the residence, S.M. let Grand in through a rear sliding glass door that was already open. According to the trial court, at no time did Grand ask S.M. for her permission to enter. S.M. did not invite or wave Grand into the residence, but she led him to the rear entrance and made no objection to his entering. Grand testified that he "broke threshold" by a short distance before announcing his presence. He then advised Lisa, S.M.'s mother, that he was there on serious business and that Harrell was coming through the security door.

When she heard the security door buzz, S.M. pushed the button to unlock the front security door without having any conversation over the intercom. Harrell then knocked on the apartment door and S.M. opened the door without speaking to Harrell. Harrell entered without asking permission and without any verbal or gesticular invitation from S.M., but also without any objection from anyone.

The officers advised Lisa that they wanted to search the apartment and said that if she did not sign a consent to search form, a warrant would be obtained. Lisa signed the consent to search and shortly afterwards told the officers that her son, M.M., had produced a small packet earlier in the day. Lisa informed the officers that she had told M.M. that she did not know what the packet was but had suggested putting it away and talking to respondent about it that evening. Lisa had moved the packet from the place where S.M. and M.M. had originally placed it; she retrieved it for the officers.

Shortly thereafter, respondent arrived home. Harrell told respondent that Lisa had already given consent and respondent replied

"Go ahead and search." No one asked the officers to leave.

Harrell then took respondent into the bedroom and advised him of his *Miranda* rights. However, Harrell did not obtain any written waiver of respondent's *Miranda* rights, nor was their conversation electronically recorded. Later, while respondent was seated at a chair in the dining room, Harrell approached respondent with the small packet of the controlled substance and respondent stated "O.K., you got me." No new *Miranda* warning was given before the statement by respondent.

The search of respondent's residence yielded approximately 1.18 grams of cocaine, including both the original packet found by S.M. and a small amount the officers found in a reclining chair.

Respondent was arrested and subsequently transported to the Mound Police Department. At the police department, respondent was interviewed by Sergeant John Wolf from the Southwest Metro Drug Task Force and Harrell. No new *Miranda* warning was given at this time. During this interview, respondent admitted taking a bindle of cocaine from the safe of the drug task force in Shakopee. Respondent subsequently was charged with two controlled substance offenses, receiving stolen goods, and misconduct as a police officer.

After a Rasmussen hearing, the trial court concluded that: S.M. gave no consent to any police officer; at best, any indication by S.M. that it was appropriate for Grand or Harrell to enter the apartment was merely the acquiescence to authority of a 10-year-old child; the state had not shown that Lisa's consent was voluntary so as to purge the taint of the illegal warrantless entry; and respondent's statements were not sufficiently independent of the illegal entry to purge the taint of the warrantless home search. The trial court suppressed all of the evidence seized from respondent's apartment and all statements made by respondent, Lisa, M.M. and S.M.

## ISSUES

1. Will the lack of the suppressed evidence have a critical impact on the outcome of the trial?

2. Did the trial court err in suppressing the evidence?

## ANALYSIS

■ In a pretrial appeal, a reviewing court will reverse the determination of the trial court only if the state demonstrates clearly and unequivocally, first, that the trial court erred in its judgment and, second, that unless reversed, the error will have a critical impact on the outcome of the trial. *State v. Joon Kyu Kim,* 398 N.W.2d 544, 547 (Minn. 1987).

### 1. *Critical Impact*

It is undisputed that the trial court's decision will have a critical impact on the trial.

> Critical impact has been shown not only in those cases where the lack of the suppressed evidence completely destroys the state's case, but also in those cases where the lack of the suppressed evidence significantly reduces the likelihood of a successful prosecution.

*Id.* at 551. The trial court's decision to suppress all of the evidence seized from respondent's apartment and all statements made by respondent, Lisa, M.M. and S.M. significantly reduces the likelihood of a successful prosecution; therefore, its decision will have a critical impact on the trial.

### 2. *Error in Suppression of Evidence*

■ The Fourth Amendment requires police officers to obtain a warrant before entering a residence. U.S. Const. amend. IV; *Payton v. New York,* 445 U.S. 573, 577, 100 S.Ct. 1371, 1374, 63 L.Ed.2d 639 (1980). However, a warrant is not required when a valid and voluntary consent to enter is given. *United States v. Briley,* 726 F.2d 1301, 1303 (8th Cir.1984). The voluntary nature of consent is to be determined based on all the relevant circumstances. *Schneckloth v. Bustamonte,* 412 U.S. 218, 227, 93 S.Ct. 2041, 2047, 36 L.Ed.2d 854 (1973); *State v. Howard,* 373 N.W.2d 596, 599 (Minn.1985). The state has the burden of showing the consent was given freely. *Bumper v. North Carolina,* 391 U.S. 543, 548, 88 S.Ct. 1788, 1792, 20 L.Ed.2d 797 (1968).

■ First, appellant argues that the trial court erred in ruling that S.M.'s consent to enter the apartment was invalid. We agree.

S.M. is a mature and intelligent [1] 10–year–old who is capable of giving consent. *See Pesterfield v. Commissioner of Pub. Safety,* 399 N.W.2d 605, 609–10 (Minn.App.1987) (17–year–old gave valid consent to warrantless entry by police to question her mother relating to complaint that her mother had been driving while under the influence). S.M. initiated contact with school officials.[2] S.M. had frequent contact with police officers because her stepfather was an officer, and she knew Grand as both her D.A.R.E. instructor and a friend of the family. From the time S.M. told the officers about the drugs, it was clear that she intended them to enter the apartment. S.M. was not arrested or restrained. Even though S.M. did not orally express her consent to the officers entering the apartment, she implied consent by leading Grand to the rear door, by buzzing the front door of the building for Harrell to enable him to enter, and by opening the front door of the apartment when he knocked on it. *See Howard,* 373 N.W.2d at 599 (consent does not have to be verbal but may be implied from conduct).

The trial court concluded that "any indication by [S.M.] that it was appropriate for Sgt. Grand, or Chief Harrell, to enter the apartment was merely the acquiescence to authority by a ten-year-old child." *See id.* (mere acquiescence on a claim of police authority or submission in the face of a show of force is not sufficient consent). Recognizing the standard of review, we conclude that the totality of the circumstances indicates that, as a matter of law, S.M. voluntarily consented to the police entering the apartment.

1. S.M. testified that she is a straight-A student. Moreover, it was she who initiated the entire inquiry by reporting the matter to school officials; having done so, she cooperated fully with the police investigation.

2. We attribute to respondent's attorney's suggestive questions S.M.'s testimony that she could not have said "no" when Jones asked if she wanted to see a police officer and that she believed she had to talk to the police and had to ride home from school with Grand.

■ Second, appellant argues that the trial court erred in concluding that Lisa's consent to search the apartment was not sufficiently voluntary to dissipate the taint of an illegal entry.[3] We agree. The officers' conduct was reasonable. They learned of the existence of cocaine in respondent's apartment from S.M. and gained no evidence from their initial entry. The officers were not strangers to Lisa. Lisa is married to a police officer; she is familiar with their procedures and she knew these officers. Both Lisa and the officers realized the matter was very delicate. Moreover, the officers did not have to search the apartment for the cocaine because Lisa retrieved the packet of cocaine from her bedroom and handed it to them.

Although respondent argues that the officers coerced Lisa by telling her that if she did not consent a search warrant would be on the way, *see United States v. Culp,* 472 F.2d 459, 461–62 (8th Cir.) (rejecting contention that consent was involuntary because of implied coercion caused by announcement of officer that officers were in the process of getting a search warrant), *cert. denied,* 411 U.S. 970, 93 S.Ct. 2161, 36 L.Ed.2d 692 (1973), the officers' statements are merely one factor to consider in the totality of circumstances. *See U.S. v. Bye,* 919 F.2d 6, 9 (2d Cir.1990) (court has "steadfastly avoided the adoption of any criterion that, in and of itself, would mandate a finding of involuntariness and thereby undermine a thorough analysis of all the relevant circumstances"). Further, the fact that Lisa was crying is unpersuasive; she may have been crying because she knew respondent was caught or because of embarrassment that S.M. had told the officers about the cocaine.

3. The trial court concluded that "all of the evidence seized from [respondent's] residence subsequent to the initial unlawful entry * * * is to be suppressed as the fruit of the poisonous tree." *See Wong Sun v. United States,* 371 U.S. 471, 484, 83 S.Ct. 407, 416, 9 L.Ed.2d 441 (1963) (evidence that is gained as the direct or indirect result of an illegal police action must be suppressed). Because we conclude that the initial entry was lawful, *Wong Sun* is inapplicable and the issue is whether Lisa's consent was voluntary.

Under the totality of the circumstances, Lisa's consent was voluntary as a matter of law. *See United States v. Smith*, 973 F.2d 1374, 1376 (8th Cir.1992) (although police officers drew their weapons when defendant's wife opened the door, wife's consent to officers' entry was voluntary because there was no evidence that they demanded entry or used physical force or threats); *United States v. Winn*, 969 F.2d 642, 644 (8th Cir. 1992) (defendant voluntarily consented to search of his home, notwithstanding that he was told that he would go to jail if he did not consent to the search and that an expert testified that defendant had IQ of 71, because defendant was able to understand when he was told he did not have to consent to search and his previous experience with the criminal law system had given him enough background to be able to understand his rights); *Howard*, 373 N.W.2d at 599 (consent was valid where defendant opened inner door completely and stepped back as if to make room for officers to enter, defendant knew officers, defendant had cooperated fully with them during the investigation, and defendant had given them a key to his house so that they could gain access to search if no one was home).

Third, appellant claims the trial court erred in concluding that appellant failed to meet its burden of proof that all respondent's statements, including his consent to search and his statements made subsequent to a *Miranda* warning, were sufficiently independent of the illegal entry to purge the taint of the warrantless home search. Because we conclude that the entry was lawful and the consent to search voluntary, we do not address this issue.

Finally, we conclude that neither officer drew his weapon, used threatening language, or engaged in any trickery or deceit when obtaining entry into and consent to search the apartment or when speaking to respondent, who made voluntary incriminating statements to the officers. *See State v. Thaggard*, 527 N.W.2d 804 (Minn.1995) (police should not use trickery or deceit to persuade a criminal suspect to confess to a crime).

## DECISION

Because both S.M. and Lisa provided valid consent to search respondent's apartment, the trial court erred in suppressing the evidence.

**Reversed and remanded for trial.**

HUSPENI, J., files opinion concurring in part and dissenting in part.

HUSPENI, Judge (concurring in part, dissenting in part).

I agree with the majority that the district court's decision to suppress all evidence seized from respondent's residence as well as all statements made by respondent, Lisa Lotton, M.M., and S.M., will significantly reduce the likelihood of a successful prosecution. *See State v. Ronnebaum*, 449 N.W.2d 722, 724 (Minn.1990) (quoting *State v. Kim*, 398 N.W.2d 544, 551 (Minn.1987), for the proposition that critical impact is shown "not only in those cases where the lack of the suppressed evidence completely destroys the state's case, but also in those cases where the lack of the suppressed evidence significantly reduces the likelihood of a successful prosecution").

S.M. testified at the suppression hearing that she believed that she had to talk to the police, that she could not have said "no" when asked if she wanted to see a police officer, and that she believed she had to ride home from school with Officer Grand.

The district court found that S.M. entered the residence followed by Grand, that the glass doors were already open, and that at no time did Grand ask S.M. for her permission to enter, nor did S.M. ask or wave Grand into the residence.

The district court also found that shortly after entering, in response to the sound of the buzzer, S.M. pushed the button unlocking the front security door without having any conversation over the intercom, assuming that this was Harrell, and that after hearing a knock on the apartment door, S.M. opened the door and Harrell entered, without asking permission to enter and without any invitation or motion by S.M. that he should enter.

The district court, sitting as fact-finder, observed S.M.'s demeanor, weighed the cred-

ibility of her testimony, found her to have been "a credible witness at the hearing herein, with no inconsistencies in her testimonies apparent to this court," and concluded that S.M. had not given consent to enter respondent's residence.

Consent is a question of fact. *Schneckloth v. Bustamonte,* 412 U.S. 218, 227, 93 S.Ct. 2041, 2047, 36 L.Ed.2d 854 (1973). Another district court, perhaps including myself, in listening to S.M.'s testimony and in observing her demeanor, might have assessed credibility in such a way as to reach conclusions different from those made here. Either assessment could be properly affirmed by an appellate court. District courts make credibility assessments and find facts as part of their duties. Appellate courts have a narrow standard of review. I would defer to the district court's credibility assessments and fact finding here and affirm the determination that S.M. did not consent.

The majority, in its analysis, was not required to address the additional issues of the import of Lisa Lotton's signing of the consent to search form, the admissibility of the evidence seized as a result of that search, and the admissibility of statements made by respondent, Lisa Lotton, S.M. and M.M. I would also, however, affirm the district court in its resolution of those issues. Lisa Lotton's consent to search was gained subsequent to the illegal entry of the officers into respondent's residence and is the fruit of a search contrary to law; all evidence seized from the residence subsequent to the initial unlawful entry is the fruit of the poisonous tree pursuant to *Wong Sun v. United States,* 371 U.S. 471, 484, 83 S.Ct. 407, 415, 9 L.Ed.2d 441 (1963).