FILED
United States Court of Appeals
Tenth Circuit

June 15, 2010

Elisabeth A. Shumaker
Clerk of Court

PUBLISH

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

v.

VICTOR SANCHEZ, JR.,

Defendant-Appellant.

No. 09-2239

---

**APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO
(D.C. NO. CR 07-148-MV)**

---

Alonzo Padilla, Assistant Federal Public Defender, Office of the Federal Public
Defender, Albuquerque, New Mexico, for Appellant.

Nicholas J. Ganjei, Assistant United States Attorney (Gregory J. Fouratt, United
States Attorney, and Joel R. Meyers, Assistant United States Attorney, with him
on the brief), Office of the United States Attorney, Albuquerque, New Mexico,
for Appellee.

---

Before **LUCERO**, **BALDOCK**, and **TYMKOVICH**, Circuit Judges.

---

**TYMKOVICH**, Circuit Judge.

---

Victor Sanchez appeals the district court's denial of his motion to suppress

the admission of 100 kilograms of marijuana discovered by probation officers

during a home visit. The home visit followed a tip that Sanchez was living beyond his means and had recently purchased a new home and car shortly after his release from prison. The district court held that Sanchez's 15-year-old daughter who was home babysitting at the time, validly consented to the inspection of the home.

We agree with the district court that Sanchez's daughter had actual authority to consent to the home visit and the officers properly relied on her consent. Although the district court found that the officers' discovery of over $100,000 cash in a bedroom was the fruit of an illegal search, it found no infirmity to the discovery of the marijuana. Since no limitations were placed on the scope of the inspection and the officers had information that led them to believe Sanchez had purchased the home and a new car without adequate financial resources, the court properly concluded the officers would have discovered the marijuana in the home's garage.

Exercising jurisdiction under 28 U.S.C. § 1291, we AFFIRM.

## I. Background

In 2005, Sanchez was convicted for possession of cocaine and a related drug conspiracy. He was sentenced to two consecutive terms of 18 months' imprisonment, suspended to three years of probation. Among other conditions, Sanchez's probation order stipulated that "I [Sanchez] will permit any Probation/Parole Officer to visit me at my home or place of employment at any time." ROA, Vol. 1 at 35. Sanchez was also required "to advise all members of

-2-

[his] household that Probation & Parole Officers will occasionally visit the residence and ask them to show courtesy and respect toward the Officers." ROA, Vol. 1 at 37.

Sanchez subsequently was imprisoned for a parole violation. After his release from prison in 2006, Sanchez moved into a home in Albuquerque with his wife and children. In December 2006, Sanchez's probation officer received a tip that Sanchez was living beyond his means. Although Sanchez was earning between $6.50 and $10 per hour at his job, the officer was told that Sanchez recently had bought a new house and car. Two probation officers were dispatched to Sanchez's residence to conduct a home visit.

A.L., Sanchez's 15-year-old daughter, greeted the officers when they arrived at the front door. The daughter stated that her father was not home. The officers, in plain clothes but displaying badges, explained that they wanted to conduct a home visit and asked whether she would "show them around the house." ROA, Vol. 3 at 118. She agreed.

The officers' and A.L.'s testimonies conflict as to what happened next. The officers testified that A.L. led them through the living room, kitchen, and eventually upstairs to the bedrooms, while A.L. claims the officers asked her to show them her father's bedroom immediately. The district court credited the officers' testimony in part because the officers had no information before the search that would have piqued their interest in Sanchez's bedroom.

Once in the bedroom, one of the officers spotted gang paraphernalia in an open closet. The officer believed the clothing evidenced a violation of Sanchez's probation order, which prohibited him from associating with "any person identified by my Probation/Parole Officer as being detrimental to my Probation supervision . . . ." ROA, Vol. 1 at 35. Based on this suspicion, the officer looked in a clothes hamper in the closet and discovered $111,000 in cash. At that point the officers called for police backup, fearing that the cash was evidence of drug trafficking.

After backup arrived, one of the officers completed the inspection of the home, unaccompanied by Sanchez's daughter. When the officer opened the door to the garage, he smelled marijuana. As the officer walked into the garage, he saw an open bag containing a brick of marijuana on the floor, and in the corner he found an open moving box filled with small packages of marijuana. In total, the officers found more than 100 kilograms of marijuana in the garage.

Sanchez was charged with possession with the intent to distribute more than 100 kilograms of marijuana. Sanchez moved to suppress the admission of the marijuana, arguing it was the product of an illegal search. The district court denied Sanchez's motion, holding that A.L. voluntarily consented to the home visit, and she had actual and apparent authority to do so. While the court concluded the officers did not have reasonable cause to search the clothes hamper, it found that the officers would have discovered the marijuana in the

garage as part of the home visit, and that discovery would have given them reasonable cause to conduct a warrantless search of the rest of the house under the terms of the probation order.

After his motion to suppress failed, Sanchez pleaded guilty but reserved his right to appeal the district court's suppression ruling. This appeal followed.

## II. Discussion

"When reviewing a district court's grant or denial of a motion to suppress, we accept the court's findings of fact unless clearly erroneous and consider the evidence in the light most favorable to the government." *United States v. Pena*, 143 F.3d 1363, 1365 (10th Cir. 1998). We review the district court's legal conclusions de novo. *See United States v. Pettigrew*, 468 F.3d 626, 633 (10th Cir. 2006).

The district court concluded that A.L.'s consent to the officers' home visit was valid, and her consent would have included the garage.

### A. Consent to the Home Visit

Although "probationers and parolees do not enjoy the full suite of rights provided by the Fourth Amendment," we recognize "law enforcement officers are not completely untethered from the Fourth Amendment when dealing with probationers." *United States v. Trujillo*, 404 F.3d 1238, 1242 (10th Cir. 2005). The law allows "reasonable conditions" of probation "that deprive the offender of some freedoms enjoyed by law-abiding citizens," including conditions requiring

the probationer to submit to warrantless searches. *See United States v. Knights*, 534 U.S. 112, 114, 120–21 (2001) ("When an officer has reasonable suspicion that a probationer subject to a search condition is engaged in criminal activity, there is enough likelihood that criminal conduct is occurring that an intrusion on the probationer's significantly diminished privacy interests is reasonable.").

The purpose of a home visit is to determine if the probationer is abiding by his probation order. Testimony from the suppression hearing suggests that home visits generally are limited to plain view inspections, although occasionally they can include more intrusive conduct. Sanchez's probation order required him to permit a home visit "at any time," and it required him to permit a warrantless search if officers had "reasonable cause" to believe he committed a probation violation.

When the probation officers arrived at Sanchez's home, they intended to conduct a home visit to confirm the basic elements of the tip. The government concedes it did not have at that time reasonable cause of a probation violation that would have justified a warrantless search. Therefore, any entry to and inspection of the home must be satisfied by A.L.'s consent.

Valid consent requires two elements. First, in the case of third-party consent, the third-party "must have [had] actual or apparent authority to do so." *United States v. Thompson*, 524 F.3d 1126, 1132 (10th Cir. 2008). Second, the consent must be "freely and voluntarily given. Whether a [party] freely and

voluntarily gave his consent to a search is a question of fact and is determined from the totality of the circumstances." *Pena*, 143 F.3d at 1366 (internal citations and punctuation omitted). The district court found both elements were met here.

*Actual Authority.* Sanchez first contends A.L. lacked either actual or apparent authority to consent to the home visit. "[A] third party has [actual] authority to consent to a search of property if that third party has either (1) mutual use of the property by virtue of joint access, or (2) control for most purposes over it." *United States v. Rith*, 164 F.3d 1323, 1329 (10th Cir. 1999). "Mutual use of property by virtue of joint access is a fact-intensive inquiry," but we recognize a third party's entering "the premises or room at will, without the consent of the subject of the search," demonstrates joint access. *Id.* at 1329–30. We have declined, however, to find mutual use by an "occasional visitor" to an apartment, *see United States v. Cos*, 498 F.3d 1115, 1126 (10th Cir. 2007), in contrast to cases such as *Rith*, where the third party was a full-time resident of the premises.

The district court concluded that A.L. had joint access, and we agree that ample evidence supports this view. First, A.L. lived full time in the house and had unrestricted access to it, particularly to the common living areas such as the downstairs and garage. A.L. testified that she (1) as a general matter "had access to the entire house," ROA, Vol. 3 at 135–36; (2) was "in charge" of the premises

when the officers visited, *id.* at 132; and (3) had "no restrictions on [her] behavior in the home at all." *Id.*

Second, at the time the officers arrived at the house, A.L. was home babysitting her younger brother, a task she regularly performed alone. Based on her testimony, the district court concluded A.L. had authority to access the entire house—including the garage—at the time of the home visit. And nothing in the record suggests any restrictions or limitations whatsoever on her access to or use of any part of the home. Sanchez argues A.L. was not allowed "to let strangers in the house," but the district court did not credit this testimony.

In short, the district court did not clearly err in finding actual authority for the search.[1]

*Voluntariness.* Next, Sanchez contends A.L.'s consent was not voluntary. We disagree.

We determine voluntariness under the totality of the circumstances. The Tenth Circuit has developed a two-part test to guide our inquiry. The government must (1) "proffer clear and positive testimony that consent was unequivocal and

---

[1] We also agree with the district court that A.L. had apparent authority to consent to the visit. Apparent authority arises from the reasonable, albeit erroneous, belief that the third party has the authority to provide valid consent. This inquiry is an objective one, based on the "facts available to the officer at the moment." *Illinois v. Rodriguez*, 497 U.S. 177, 188 (1990) (quoting *Terry v. Ohio*, 392 U.S. 1, 21–22 (1968)). The district court concluded the totality of the circumstances would have led a reasonable officer to believe A.L. was old and mature enough to give consent.

specific and freely and intelligently given," and (2) the officers must have used no "implied or express duress or coercion." *United States v. Taverna*, 348 F.3d 873, 878 (10th Cir. 2003) (citation and internal punctuation omitted).

The record supports the district court's finding of voluntariness. As to consent, the district court found that the probation officers asked A.L. to "show [them] around the residence," and she agreed without reservation. A.L. freely showed the officers the first floor living quarters and then the second floors, even letting them enter her bedroom and her parents' bedroom. *See* ROA, Vol. 3 at 24; *see also id.* at 30–31, 33, 76, 118–19, 138, 152–53. In addition, no evidence suggests coercion. She knew who the probation officers were when they asked for consent, and nothing indicates the officers used implied threats or intimidation. The officers were in plain clothes with badges, the visit was during the middle of the day, and no show of force or display of weapon was employed.

A.L.'s age is not a bar to consent. Our case law applies no per se rule against a minor's consenting to entry onto private property—age is but one factor within the totality of the circumstances we consider when determining whether the consent was voluntary. *See United States v. Gutierrez-Hermosillo*, 142 F.3d 1225, 1231 (10th Cir. 1998). For example, in *Gutierrez-Hermosillo*, we upheld a 14-year-old minor's consent for police to enter a motel room she shared with her father. Other courts have reached the same conclusion and found valid consent from even younger minors. *See, e.g., Lenz v. Winburn*, 51 F.3d 1540 (11th Cir.

1995) (age 9); *United States v. Clutter*, 914 F.2d 775 (6th Cir. 1990) (ages 12 and 14); *State v. Lotton*, 527 N.W.2d 840 (Minn. App. 1995) (age 10).

Here, the district court found A.L. was a relatively sophisticated teenager. She routinely was in charge of the family's house and her younger brother. The officers testified that she appeared calm and mature, and one officer said she appeared to be 16 or 17 years old. When the officers asked if they could enter the house, she agreed without reservation and conducted a tour that included several bedrooms. Based on A.L.'s testimony and demeanor at the hearing, the district court found that the consent was freely given.

In sum, given the circumstances here, we cannot conclude the district court clearly erred in finding A.L. had the actual authority to approve the search, and her consent was voluntary.

### B. Causation and Inevitable Discovery

After obtaining consent, the officers toured the house, looking in both A.L.'s and Sanchez's bedrooms. One officer noticed in plain view what he believed to be gang apparel. The officer concluded the clothing was evidence of a probation violation—associating with gang members—and proceeded to look in a clothes hamper where he found $111,000.

At the suppression hearing, the district court concluded the gang attire did not in and of itself create a reasonable belief Sanchez violated the terms of his probation order. It found the probation order did not specifically prohibit

-10-

Sanchez from associating with gang members, and therefore the clothing was not capable of creating a reasonable suspicion of a probation violation. Accordingly, the clothing did not provide reasonable cause for a warrantless search of the clothes hamper. Nonetheless, the court went on to conclude the hamper search did not taint the marijuana's discovery because the officers inevitably would have visited the garage during the home visit, even if they had not discovered the cash.

Sanchez disagrees, and contends that once the district court concluded the hamper search was illegal, any subsequent discovery by the officers was "fruit of the poisonous tree" and tainted by the illegal search.

To succeed in suppressing the marijuana, Sanchez must show the discovery "would not have come to light *but for* the government's unconstitutional conduct." *United States v. Nava-Ramirez*, 210 F.3d 1128, 1131 (10th Cir. 2000) (emphasis added). If Sanchez shows "but for" causation, the government must then prove the "evidence sought to be suppressed is not 'fruit of the poisonous tree' either by demonstrating the evidence would have been inevitably discovered, was discovered through independent means, or was so attenuated from the illegality as to dissipate the taint of the unlawful conduct." *Id.*; *see also United States v. Torres-Castro*, 470 F.3d 992, 999 ("'But for' causality is a necessary, but not a sufficient, requirement for suppression."). "The inevitable discovery doctrine provides an exception to the exclusionary rule and permits evidence to be admitted if an independent, lawful police investigation inevitably would have

-11-

discovered it." *United States v. Cunningham*, 413 F.3d 1199, 1203 (10th Cir. 2005) (internal citation and punctuation omitted).

Sanchez fails to demonstrate "but for" causation. We agree with the district court that no factual nexus connects the constitutional violation—the search of the clothes hamper—and the inspection of the garage. Ample record evidence supports this conclusion. The officers had been tipped off to alleged purchases of a new house and a new car, which suggested Sanchez was living beyond his means and may have resumed criminal activity. Although the home visit began in the common living areas of the home, the district court found that A.L.'s consent was not limited to public areas but included more private areas such as the bedrooms. Given this breadth of consent, the court concluded the consent would have included the garage.

This conclusion flows naturally from the court's previous findings. A.L. methodically led the officers from room to room, which reasonably manifested consent to enter each room. *See United States v. Espinosa*, 782 F.2d 888, 892 (10th Cir. 1986) ("Failure to object to the continuation of the search . . . may be considered an indication that the search was within the scope of the consent."). She even let the officers look in her bedroom, where they could see empty bottles of alcohol and a poster of a marijuana plant. A.L. testified she had no knowledge of marijuana in the garage, and she would have had no reason to restrict the officers from looking into the garage. As the district court concluded,

"The garage is an extension of the home and an obvious place for a probation officer to inspect during a home visit, especially when an officer is looking for evidence that a probationer may be living beyond his means. In this case, [the officer] received information that Defendant had recently purchased a new car, which indicated he may be living beyond his means. Therefore, this information would have undoubtedly led [the officers] to look in the garage as part of the home visit."

ROA, Vol. 1 at 60.[2]

Once the officers looked in the garage, the marijuana was in plain view. The garage smelled of marijuana, and the officers could see open boxes of marijuana, some of which had been spilled on the floor. When the officers entered the garage, more marijuana in small plastic bags was sitting in an open container.

In sum, nothing in the record—neither the daughter's actions nor testimony—suggests A.L. would have withdrawn her previously uniform consent when the officers arrived at the garage door. Once there, opening the garage door alerted the officers to the presence of marijuana.

We reach this conclusion mindful of the purposes of the exclusionary rule. The police did not seek to exploit unconstitutional conduct or profit from their wrongdoing. Here, the officers acted on A.L.'s consent, a source independent

_____

[2] The district court also concluded the money found in the hamper inevitably would have been discovered given the certainty the officers would have discovered the marijuana in the garage, thereby providing reasonable cause for a search of the entire house under the probation order. That conclusion is not before us in this appeal.

-13-

from the illegal search of the clothes hamper. The inspection of the garage did not flow from the bedroom search. Rather, it was part of what would otherwise be characterized as a routine home inspection, an inspection specifically directed at determining whether the probationer had purchased any new motor vehicles.

Given this factual record, the district court did not clearly err when it held the officers inevitably would have discovered the marijuana in the garage and that this discovery was not the fruit of an illegal search.

### III. Conclusion

For the foregoing reasons, we AFFIRM the district court's denial of Sanchez's motion to suppress.

09-2239, United States v. Sanchez

**LUCERO**, J., concurring.

I concur in the majority opinion because our precedent and the somewhat unusual facts presented compel its reasoning and result. I write separately, however, to state my dismay that we apply third-party consent rules designed for adult relationships to relationships involving children. A child is not a roommate; our third-party consent doctrine should recognize this fact.

**I**

In United States v. Matlock, 415 U.S. 164 (1974), the Supreme Court held that "the consent of one who possesses common authority over premises or effects is valid as against the absent, nonconsenting person with whom that authority is shared." Id. at 170. This "third-party consent" doctrine depends not

> upon the law of property, with its attendant historical and legal refinements, but rests rather on mutual use of the property by persons generally having joint access or control for most purposes, so that it is reasonable to recognize that any of the co-inhabitants has the right to permit the inspection in his own right and that the others have assumed the risk that one of their number might permit the common area to be searched.

Id. at 171 n.7 (citations omitted).

Our circuit has crafted a two-part, disjunctive test for applying Matlock: "[A] third party has authority to consent to a search of property if that third party has either (1) mutual use of the property by virtue of joint access, or (2) control for most purposes over it." United States v. Rith, 164 F.3d 1323, 1329 (10th Cir. 1999). The first prong can be satisfied by showing that "the third party entered

the premises or room at will, without the consent of the subject of the search."

United States v. Cos, 498 F.3d 1115, 1125 (10th Cir. 2007) (quotation omitted).

This is a "fact-intensive inquiry." Id. The second prong is "a normative inquiry

dependent upon whether the relationship between the defendant and the third

party is the type which creates a presumption of control for most purposes over

the property by the third party." Rith, 164 F.3d at 1330.

In addition, a third party may possess apparent authority to permit entry

even if she lacks actual authority. "[A] third party has apparent authority if the

officer has a reasonable belief that the third party has (1) mutual use of the

property by virtue of joint access, or (2) control for most purposes over it." Cos,

498 F.3d at 1128 (quotation omitted). "Importantly, where an officer is presented

with ambiguous facts related to authority, he or she has a duty to investigate

further before relying on the consent." Id. (quotation omitted).

This framework serves us well when we consider whether an adult may

consent to the search of premises he or she shares with another adult, but the

rationale for Matlock should lead us to conclude in many instances that a minor

child in a parent's home lacks both actual and apparent authority to similarly

consent. The Supreme Court discussed the basis for Matlock at some length in

Georgia v. Randolph, 547 U.S. 103 (2006), an opinion addressing whether police

may enter and search a home when one co-occupant consents to a search, but

another present co-occupant expressly refuses. It explained that Matlock rests on

-2-

a theory of "assumption of risk." Randolph, 547 U.S. at 111. In most co-occupant relationships, roommates "understand that any one of them may admit visitors, with the consequence that a guest obnoxious to one may nevertheless be admitted in his absence by another." Id.[1] Just as a co-occupant might invite a member of the general public into a home despite an absent roommate's objection, an adult who enters into a shared living arrangement assumes the risk that a co-occupant will permit police entry. In other words, Matlock rests in part upon the general rule that we treat police officers like other members of the public when they are not exercising powers unique to law enforcement. See California v. Greenwood, 486 U.S. 35, 40-41 (1988) (police do not need a warrant to search garbage bags left on the street for trash collection); California v. Ciraolo, 476 U.S. 207, 213-14 (1986) (no warrant needed to fly over back yard because "[a]ny member of the public flying in this airspace who glanced down could have seen everything that these officers observed"); Texas v. Brown, 460 U.S. 730, 740 (1983) (police may look under a vehicle parked on the street because "there is no reason [police] should be precluded from observing as an officer what would be entirely visible to him as a private citizen").

---

[1] The Court recognized the possibility that a given set of idiosyncratic roommates might "make an exceptional arrangement that no one could admit a guest without the agreement of all," but held that "the chance of such an eccentric scheme is too remote to expect visitors to investigate a particular household's rules before accepting an invitation to come in." Id. at 111-12.

In Randolph, the Court relied extensively on this ordinary citizen analogy. Holding that police may not enter at the invitation of one co-occupant when another present co-occupant objects, the Court reasoned:

> [I]t is fair to say that a caller standing at the door of shared premises would have no confidence that one occupant's invitation was a sufficiently good reason to enter when a fellow tenant stood there saying, "stay out." Without some very good reason, no sensible person would go inside under those conditions.

Randolph, 547 U.S. at 113. Thus, in assessing whether third-party consent to a police search is effective, we must consider whether an ordinary citizen would be permitted entry under the common understanding of a consenter's authority.

But the Matlock reasoning breaks down when applied to consenting minor children. The common understanding of an adult co-occupant's authority stands in stark contrast to that of a child. Although we would expect a roommate to be free to invite whatever guests she chooses into the shared home, we cannot apply that presumption for most minor children. That is, one normally assumes that a minor child is not allowed to invite guests into the home absent a parent's approval.

The two-part Rith test, derived from language used in Matlock, does not mesh well with this reality. Although one may sensibly presume that an adult who has "mutual use of the property by virtue of joint access" also possesses authority to invite callers into the home, Rith, 164 F.3d at 1329, the same is not true of minor children. An occupant's young children will frequently have joint

-4-

access to a home but will only rarely be given free range to invite guests. Similarly, children have "control for most purposes" over their parent's home, id., in that they may often find themselves home alone and thus "in charge." Nonetheless, their authority over the home is dependent upon and limited by a parental grant of responsibility. The assumption we permit police to make—that a co-occupant has authority to permit entry of a guest when she has joint access to or control for most purposes over a home—does not hold water when the consenting co-occupant is a minor child.

## II

The Supreme Court appears to have recognized that children should not be treated like adults in the third-party consent context. It noted in Randolph that most co-occupant disputes must be resolved "through voluntary accommodation, not by appeals to authority," but acknowledged that some shared living arrangements, "like a household of parent and child," fell outside the general rule. 547 U.S. at 114. The Court further stated that the common understanding of a roommate's authority to permit entry into common areas of a home does not necessarily extend to every nook and cranny of the shared residence:

> [W]hen it comes to searching through bureau drawers, there will be instances in which even a person clearly belonging on premises as an occupant may lack any perceived authority to consent; a child of eight might well be considered to have the power to consent to the police crossing the threshold into that part of the house where any caller, such as a pollster or salesman, might well be admitted, but no

-5-

one would reasonably expect such a child to be in a position to authorize anyone to rummage through his parents' bedroom.

Id. at 112 (quotation and citation omitted).

Despite this recognition, several circuits, including our own, have used the Matlock framework to determine whether minor children can provide third-party consent. In United States v. Gutierrez-Hermosillo, 142 F.3d 1225 (10th Cir. 1998), we applied Matlock and its progeny in holding that a fourteen-year-old could validly consent to police entry into a motel room that she and her father occupied. Id. at 1230-31. We held that "minority does not, per se, bar a finding of actual authority to grant third-party consent to entry," and that the daughter's "mutual use of the motel room" gave rise to a reasonable assumption that she had actual authority to permit police entry. Id. at 1231. Although we recognized that a child's age "is a factor in determining the voluntariness of her consent," id., we did not factor it into the actual or apparent authority inquiry.[2]

The majority opinion dutifully applies this precedent, and I therefore concur. But in my view Gutierrez-Hermosillo was wrongly decided. It was based

[2] We also stated in Rith that the "parent-child relationships and husband-wife relationships" give "rise to a presumption of control of property." 164 F.3d at 1330. However, Rith itself and the cases we cited in support of this proposition concerned a parent's authority to consent to a search of a child's room. See United States v. Ladell, 127 F.3d 622, 624 (7th Cir. 1997); United States v. DiPrima, 472 F.2d 550, 551 (1st Cir. 1973). I do not read Rith to presume that a child has control of her parents' property. This construction is supported by Rith itself, in which we quote DiPrima's statement that "[e]ven if a minor child, living in the bosom of a family, may think of a room as 'his,' the overall dominance will be in his parents." Rith, 164 F.3d at 1330 (quoting DiPrima, 472 F.2d at 551).

in part on <u>Lenz v. Winburn</u>, 51 F.3d 1540 (11th Cir. 1995), an Eleventh Circuit opinion that directly addressed whether minors can provide third-party consent. Our sister circuit provided four reasons for its affirmative answer:

> First, privacy is an intuitive interest, and legal sophistication is not required even for adults to give valid consent. Hence, minors need not necessarily be presumed incapable of knowing consent. Second, the list of factual considerations bearing upon the voluntariness of the consent is open-ended. The youth of the consenter, with its attendant vulnerability to coercion, is certainly among them. This individualized assessment obviates the need for a categorical rule to protect subjects of searches from subtle coercive tactics to secure a minor's consent. Third, consent searches serve a legitimate purpose that is properly balanced against the cost of limiting a minor's ability to consent. This balancing counsels against a bright-line rule prohibiting minor consent. Finally, the rationale behind third-party consent involves no notion of agency. Rather, the third-party consent rule recognizes that sharing space with another lessens the expectation of privacy in that space. This compromise of the expectation of privacy is no less the case for a minor co-occupant than for an adult.

<u>Id.</u> at 1548-49 (citations omitted). The first three bases elide the issue, and the fourth is simply incorrect.

The first two rationales discuss whether children have the capacity to voluntarily consent, which does not meaningfully inform the question of whether <u>Matlock</u> is the appropriate framework through which to evaluate third-party consent provided by a minor. Certainly a teenager can consent to the search of her person or her property in some instances, but that does not answer the question of whether the child has the authority to consent to a search of her parents' home or her parents' property. The third justification is nothing more

than a statement that consent searches serve a legitimate purpose; again, this touches only tangentially on the propriety of extending Matlock to minors.

Only the fourth reason engages the grounding of the third-party-consent rule, but it does so incorrectly. Lenz properly notes that Matlock does not rest upon a theory of permission, stating that the third-party consent doctrine "involves no notion of agency." 51 F.3d at 1549. We do not ask whether the absent co-occupant has given permission to a present co-occupant to consent to a search. But Lenz then turns astray.

First, Lenz misconstrues the central underpinning of Matlock: the conclusion that, when a co-occupant has "joint access or control for most purposes," then "it is reasonable to recognize that" the co-occupant "has the right to permit the inspection in his own right and that the others have assumed the risk that one of their number might permit the common area to be searched." Matlock, 415 U.S. at 171. n.7. The Matlock rule is thus based on a factual conclusion: When an adult has joint access or control over a dwelling for most purposes, she almost always has the authority to permit callers—including police officers—to enter the home. This conclusion does not follow when the third-party consenter is a minor child: Children do not generally possess authority to permit guests simply because they have joint access to the family home. Lenz misses this point entirely. Rather than examining whether Matlock's reliance "on what was usual," Randolph, 547 U.S. at 112, among adult co-habitants holds true when the

consenter is a child, <u>Lenz</u> instead broadly states that individuals in shared living arrangements suffer a reduced expectation of privacy, and simply concludes this diminution is "no less the case for a minor co-occupant than for an adult," 51 F.3d at 1549.

What a strange conclusion:  a parent surrenders a portion of her Fourth Amendment rights simply by bearing and raising a child.  This startling assertion is wholly unsupported.  Further, under this rule of law, parents would be forced to install deadbolts on their bedroom door in order to protect their privacy against consent granted by their minor children, as the district court implied below.

More fundamentally, <u>Lenz</u> misreads the justification for the third-party consent rule.  <u>Matlock</u> is not based on a reduced expectation of privacy on the part of the absent co-tenant; it is based on the present co-tenant's independent authority (actual or apparent) to consent to a search.  <u>See</u> <u>Illinois v. Rodriguez</u>, 497 U.S. 177, 186 n.* (1990) (rejecting as "strange in the extreme" Justice Marshall's dissent, which interpreted the third-party-consent doctrine as based on a reduced expectation of privacy rationale).

Sadly, the Sixth Circuit has joined us in adopting <u>Lenz</u>'s faulty logic.  <u>See</u> <u>United States v. Clutter</u>, 914 F.2d 775, 777-78 (6th Cir. 1990).  State courts have not been as willing.  The California Supreme Court rejected a mechanistic application of <u>Matlock</u> in considering whether an eleven-year-old child's consent to a police search of her parents' home was valid.  <u>People v. Jacobs</u>, 729 P.2d

757, 762-63 (Cal. 1987). The Jacobs court appropriately looked to the basis of the third-party consent doctrine and to the practical reality that children present unique considerations:

> Minor children . . . do not have coequal dominion over the family home. Although parents may choose to grant their minor children joint access and mutual use of the home, parents normally retain control of the home as well as the power to rescind the authority they have given. It does not startle us that a parent's consent to a search of the living room in the absence of his minor child is given effect; but we should not allow the police to rely on the consent of the child to bind the parent. The common sense of the matter is that the parent has not surrendered his privacy of place in the living room to the discretion of the child; rather, the latter has privacy of place there in the discretion of the former.

Id. at 763 (citation, quotation, and alterations omitted, emphasis added). The court held that third-party consent is ineffective unless police show that the "mutual use [is] such 'that it is reasonable to recognize that any of the co-inhabitants has the right to permit the inspection in his own right and that the others have assumed the risk that one of their number might permit the common area to be searched.'" Id. at 762 (quoting Matlock, 415 U.S. at 171 n.7). Applying this rule, the court concluded that the eleven-year-old did not have actual or apparent authority to consent to the search. Id. at 763.

Other state courts have reached similar conclusions. In Commonwealth v. Garcia, 387 A.2d 46 (Pa. 1978), the Supreme Court of Pennsylvania recognized the importance of minority in evaluating the validity of third-party consent. Noting that a "third party with insufficient dominion over the premises may not

-10-

consent to a search thereof," the court interpreted the doctrine as centering "around whether that third party had co-equal dominion and control over the area or property to be searched." Id. at 55 (citing Chapman v. United States, 365 U.S. 610 (1961), and Stoner v. California, 376 U.S. 483 (1964)). As applied to a child, the court reasoned that a sixteen-year-old "did not have dominion over the home equal to that of appellant. The appellant had the power to determine the extent of her daughter's authority to admit people to the house and therefore [the daughter's] consent was ineffective." Garcia, 387 A.2d at 55.

The Georgia courts have established a four-part test to determine whether a child may consent to a search of the familial home; they consider "whether the minor lived on the premises; whether the minor had a right of access to the premises and the right to invite others thereto; whether the minor was of an age at which he or she could be expected to exercise at least minimal discretion; and whether officers acted reasonably in believing that the minor had sufficient control over the premises to give a valid consent to search." Atkins v. State, 325 S.E.2d 388, 390 (Ga. Ct. App. 1984), aff'd, 331 S.E.2d 597, 599 (Ga. 1985); see also Davis v. State, 422 S.E.2d 546, 549 (Ga. 1992) (holding that, under the four-part test, a ten-year-old child home alone for ninety minutes "had no right, absent an emergency, to invite anyone into the house while he was alone there, much less into his parents' bedroom" (emphasis omitted)).

These cases recognize that the central assumption of <u>Matlock</u> falters when applied to children. Because most children, and especially most young children, lack the authority to invite guests into the home without their parents' permission, in most circumstances police should not be permitted to rely on a child's consent to search a home. Like the Georgia courts, I would not impose a per se ban on third-party consent from a minor. Although some children are obviously too young to invite guests into the home, some teenagers might be granted something akin to co-equal dominion over a home. But the default assumption when a minor answers the door should be that the child lacks authority to consent to a home search. Only when the government can demonstrate that a specific minor actually has parental permission to allow guests into the home would the third-party consent doctrine condone the search. I would not credit a police assumption that a minor has authority to provide third-party consent when the officer failed to inquire. <u>See</u> <u>Cos</u>, 498 F.3d at 1128 ("[W]here an officer is presented with ambiguous facts related to authority, he or she has a duty to investigate further before relying on the consent." (quotation omitted)).

Applying a presumption that children lack the authority to consent to a search of the parental home would provide the proper incentives to law enforcement personnel. Few would doubt that children are more susceptible than adults to coercion and concomitantly less likely to stand up to a law enforcement official to assert their Fourth Amendment rights. <u>Cf.</u> <u>United States v. Elkins</u>, 300

F.3d 638, 647 (6th Cir. 2002) ("Several factors should be examined to determine whether consent is valid, including the age, intelligence, and education of the individual . . . ." (emphasis added, quotation omitted)). Recognizing this fact, police lacking probable cause but desirous of searching a dwelling might target a time they know children would be home alone, in an attempt to gains consent to search. Such a practice is to be strongly discouraged. Imagine, for example, police waiting until a suspect leaves home for work to approach the suspect's child and request entry into the home. The very notion is repulsive, yet our current precedent encourages similar tactics.

### III

As noted supra, I concur despite my disagreement with Gutierrez-Hermosillo because the majority properly applies Tenth Circuit precedent. Under a more sensible application of the Matlock test, however, it is not clear that this case would be decided differently: The district court credited testimony from A.L., Victor Sanchez's fifteen-year-old daughter, that she had "no restrictions on [her] behavior in the home at all." A.L. also testified that her father told her every morning (except the morning of the day at issue) not to open the door for strangers, but the district court apparently rejected this testimony as not credible. These factual findings may be sufficient to support a determination of actual authority on A.L.'s part, but because Matlock is applied to children in our circuit, we do not conduct the pertinent analysis.

-13-