*This opinion will be unpublished and
may not be cited except as provided by
Minn. Stat. § 480A.08, subd. 3 (2014).*

**STATE OF MINNESOTA
IN COURT OF APPEALS
A14-0873**

State of Minnesota,
Respondent,

vs.

Delbert Keith Sybrandt,
Appellant.

**Filed June 15, 2015
Affirmed
Hudson, Judge**

Pine County District Court
File No. 58-CR-13-593

Lori Swanson, Attorney General, St. Paul, Minnesota; and

John K. Carlson, Pine County Attorney, Steven C. Cundy, Assistant County Attorney, Pine City, Minnesota (for respondent)

Ll. Rhyddid Watkins, Special Assistant Public Defender, Karianne Jones, Certified Student Attorney, Minneapolis, Minnesota (for appellant)

Considered and decided by Reyes, Presiding Judge; Hudson, Judge; and Bjorkman, Judge.

## U N P U B L I S H E D   O P I N I O N

**HUDSON** , Judge

Appellant challenges his conviction of possession of a firearm by an ineligible

person, arguing that the district court erred by finding that a disassembled pellet gun

constitutes a "firearm" under Minn. Stat. § 624.713, subd. 1 (2012), and alternatively that the evidence obtained from the warrantless search should be suppressed because it was illegally obtained. We affirm.

**FACTS**

On August 13, 2013, police were dispatched to a property in Pine County on the report of a stolen motorcycle located there. The responding officers were familiar with the residence based on prior encounters. The officers went to the side of the house and onto the main entry off the patio, although there is a door closer to the driveway. Through a sliding glass door, officers observed appellant Delbert Keith Sybrandt sitting on the couch with "what appeared to be a rifle barrel in his lap." Officers recognized Sybrandt as a person ineligible to possess firearms. Officers knocked on the door, Sybrandt lunged out of view, and then came to the door empty-handed. When questioned about the firearm he attempted to close the door, but an officer's foot was in the way. Officers pulled Sybrandt out of the house and handcuffed him.

After Sybrandt told officers the house was empty, the homeowner's 15-year-old daughter came outside. She stated that Sybrandt was not supposed to be in the house and gave officers permission to enter. Officers found a Gamo pellet gun in pieces on the living room couch and end table. The Gamo's trigger, barrel, stock, and scope were detached from each other. Sybrandt said he was repairing the Gamo for the homeowner's son.

One of the officers testified that the Gamo was operated by "break action," and not $CO_2$, that "it was just like a spring gun" and needed to be pumped to fire. But the officer

2

also stated that he did not see a spring or ascertain exactly how the Gamo operated. A jury found Sybrandt guilty of possession of a firearm by an ineligible person. *See* Minn. Stat. § 624.713, subd. 1(2) (prohibiting a person who has been convicted of a crime of violence from possessing "a pistol or semiautomatic military-style assault weapon or . . . any other firearm"). This appeal follows.

## DECISION

## I

Sybrandt first argues that the district court erred by finding that the pellet gun satisfied the firearm component of the felon-in-possession statute and instructing the jury that "[a] BB gun is a firearm as a matter of law."[1] District courts have "considerable latitude" in selecting jury instruction language. *State v. Baird*, 654 N.W.2d 105, 113 (Minn. 2002). "[J]ury instructions must be viewed in their entirety to determine whether they fairly and adequately explained the law of the case." *State v. Flores*, 418 N.W.2d 150, 155 (Minn. 1998). "An instruction is in error if it materially misstates the law." *State v. Kuhnau*, 622 N.W.2d 552, 556 (Minn. 2001). We review statutory interpretation de novo because it presents a question of law. *State v. Newman*, 538 N.W.2d 476, 477 (Minn. App. 1995), *review denied* (Minn. Nov. 30, 1995).

Sybrandt does not dispute that he is prohibited from possessing a firearm. But he contends that the Gamo is not a firearm. "Firearm" is not defined by the felon-in-

---

[1] We note that a BB gun and pellet gun are very similar, but vary in the type of shot fired. *See Random House Webster's Unabridged Dictionary* 180, 1431 (2d ed. 1998) (defining "BB" as a "size of shot, .18 in. in diameter, fired from an air rifle or BB gun" and "pellet" as a "a charge of small shot").

3

possession statute. Minn. Stat. § 624.713, subd. 1(2); *cf.* Minn. Stat. § 624.712, subd. 2 (2012) (defining "pistol" and specifically excluding BB guns from that definition). Sybrandt urges us to limit the definition of "firearm" under the felon-in-possession statute to a "gun from which shot or a projectile is discharged by means of an explosive, a gas, or compressed air." *See* Minn. Stat. § 97A.015, subd. 19 (2012) (defining "firearm" for purposes of game-and-fish law). He argues that the Gamo is spring operated and not fired "by means of an explosive, a gas, or compressed air," and therefore should not be considered a "firearm" for purposes of the felon-in-possession statute. The record does not establish how the Gamo operated.[2] At trial, the responding officer stated that he did not know precisely how the Gamo functioned and whether or not it was spring operated. And though the jury examined the Gamo during their deliberations, there is no other evidence that explains how the Gamo fired. Despite that lack of evidence, the jury was instructed that "[a] BB gun is a firearm as a matter of law." Accordingly, we must decide whether the definition of "firearm" under the felon-in-possession statute includes BB guns that are not fired by an explosive, a gas, or compressed air. For the reasons stated below, we conclude that it does.

---

[2] The state submitted evidence on appeal that the Gamo is a high-powered air rifle, claiming that the prosecutor knew this at trial but did not have evidence available. But we cannot consider this information because it is not part of the district court record. *State v. Larson*, 520 N.W.2d 456, 464 (Minn. App. 1994) ("[M]atters not produced and received in evidence below may not be considered." (quotation omitted)), *review denied*, (Minn. Oct. 14, 1999). Likewise, Sybrandt's claim that he would have testified the Gamo was spring operated is not relevant because Sybrandt chose not to testify and made no attempt to offer this information as evidence at trial.

In *State v. Seifert*, the defendant argued that the $CO_2$ powered BB pistol he possessed was not a "dangerous weapon" as defined by the criminal code. 256 N.W.2d 87, 88 (Minn. 1977). The Minnesota Supreme Court held that "the fact that the gun defendant used required gas rather than gunpowder to discharge its projectile does not mean . . . that the gun could not be a firearm" as defined by statute. *Id.* Rather, the court explained that "firearm" "should be defined broadly to include guns using newer types of projectile propellants." *Id.* In addition, the court concluded that the $CO_2$ pistol met the definition of "firearm" from game-and-fish law, which defined "firearm" as "any gun from which shot or a projectile is discharged by means of an explosive, gas, or compressed air." *Id.* The court also noted that the pistol might also qualify as a dangerous weapon under the alternative test used in the dangerous weapon definition. *Id.*; Minn. Stat. § 609.02, subd. 6 (2012) (defining "dangerous weapon" as "any device designed as a weapon and capable of producing death or great bodily harm"). Significantly, *Seifert* did not limit the definition of firearm to those weapons that were "discharged by means of an explosive, gas, or compressed air"; but instead considered the statutory definition of "dangerous-weapons" and did not exclude guns using other "types of projective propellants." *Seifert*, 256 N.W.2d at 87.

Similarly, in *State v. Fleming*, the district court dismissed the charges against a defendant who possessed a BB gun and was ineligible to possess a firearm because it interpreted the felon-in-possession statute to exclude BB guns. 724 N.W.2d 537, 538 (Minn. App. 2006). Reversing the district court, this court noted that, in *Seifert*, the Minnesota Supreme Court adopted the definition of a firearm as "any gun from which a

5

shot or a projectile is discharged by means of explosive, gas, or compressed air." *Id.* at 540 (quotation omitted). This court then concluded that the defendant's BB gun fell under the definition of "firearm." *Id.* We acknowledge that the BB gun in *Fleming* utilized a gas cartridge. *Id.* But we also note that the *Fleming* court held that "the operative definition of 'firearm' includes a BB gun" without limiting the definition of "firearm" to gas, explosive, or compressed-air powered BB guns. *Id.* at 541.

Our examination of other statutes and contexts also informs our analysis. To that end, the "dangerous weapons" statute also does not define "firearm" but contains a reference to the game-and-fish law definition of firearm and defines BB gun as "a device that fires or ejects a shot measuring .18 of an inch or less in diameter." Minn. Stat. § 609.66, subd. 1d(e)(1) (2012). The definition does not indicate how a BB gun is powered. *Id.* In addition, we have held that a BB gun is a dangerous weapon in the context of a drive-by shooting because "it probably would not matter to the victim of a drive-by shooting [how] the weapon used in the attack was powered" because the harm will be the same under most circumstances. *Newman*, 538 N.W.2d at 478.

Because the legislature did not further define "firearm" under the felon-in-possession statute after *Seifert* and *Fleming*, we presume, as as our statutory canons of construction require, that "the legislature presumptively adopted the Minnesota Supreme Court's definition" from game-and-fish law. *Fleming*, 724 N.W.2d at 540; Minn. Stat. § 645.17(4) (2012) (stating that when the Minnesota Supreme Court has "construed the language of a law, the legislature in subsequent laws on the same subject matter intends the same construction to be placed upon such language"). But neither *Seifert* nor

6

*Fleming* expressly limits the definition of a firearm to those weapons that are "discharged by means of an explosive, gas, or compressed air." *Seifert*, 256 N.W.2d at 88; *Fleming*, 724 N.W.2d at 540-41. Accordingly, even assuming the Gamo is spring operated, we conclude that the district court did not err when it instructed the jury that a "BB gun is a firearm as a matter of law."

## II

Sybrandt next argues that even if he was prohibited from possessing the Gamo, it could not constitute a firearm because it was disassembled. "[T]he felon-in-possession statute may properly be applied to possession of an inoperable [gun]." *State v. Knaeble*, 652 N.W.2d 551, 552 (Minn. App. 2002), *review denied* (Minn. Jan. 21, 2003).

In *Knaeble*, a felon possessed a shotgun that was "inoperable 'in a traditional sense' because the hammer springs were broken." *Id.* at 553. An expert testified that the shotgun could be fired if the hammer were manually struck. *Id.* This court held, based on previous Minnesota Supreme Court decisions considering the possession of inoperable firearms in the context of dangerous and illegal firearms, that possession of an inoperable firearm was sufficient to convict under the felon-in-possession statute. *Id.* at 554-55.

Neither party cites precedential caselaw on whether the possession of a disassembled—and not merely inoperable—firearm is prohibited by Minn. Stat. § 624.713, subd. 1. We are similarly unable to locate any dispositive authority. But the plain language of the statute does not require the state to prove a firearm was operable at the time of possession. *See* Minn. Stat. § 624.713, subd. 1. Moreover, contrary to Sybrandt's claims, he did not simply have a box of random gun parts. Sybrandt was

7

actively repairing the Gamo when the officers knocked on the door and all the gun's major components were close by. The Gamo could easily have been assembled. We thus conclude that the Gamo's disassembled state at the time of discovery does not prohibit Sybrandt's felon-in-possession conviction.

## III

Sybrandt finally argues that the Gamo was obtained during an unlawful search and should therefore be suppressed. The United States and Minnesota Constitutions protect against unreasonable searches. U.S. Const. amend. IV; Minn. Const. art. I, § 10. Any evidence acquired as the result of an unlawful search must be suppressed. *Wong Sun v. United States*, 371 U.S. 471, 484, 83 S. Ct. 407, 416 (1963); *State v. Askerooth*, 681 N.W.2d 353, 370 (Minn. 2004). A warrantless search of a home is presumed unreasonable unless there is an exception to the warrant requirement. *Kyllo v. United States*, 533 U.S. 27, 37, 121 S. Ct. 2038, 2045 (2001); *State v. Thompson*, 578 N.W.2d 734, 740 (Minn. 1998). Searches conducted with valid, voluntary consent are an exception to the warrant requirement. *State v. Othoudt*, 482 N.W.2d 218, 222 (Minn. 1992). The state has the burden of proving consent. *Id.* "The question of whether consent is voluntary is a question of fact, and is based on the totality of circumstances." *Id.* Here, the district court found the search constituted an exception to the warrant requirement based on the consent of the homeowner's 15-year-old daughter, E.K.

This court reviews the district court's finding of voluntary consent for clear error. *State v. Diede*, 795 N.W.2d 836, 846 (Minn. 2011). We "view the evidence in the light most favorable" to the outcome and will affirm the district court's decision "if there is

reasonable evidence in the record to support the court's findings." *Rasmussen v. Two Harbors Fish Co.*, 832 N.W.2d 790, 797 (Minn. 2013) (quotations omitted). We will reverse only if we are left with the definite and firm conviction that a mistake occurred. *Diede*, 795 N.W.2d at 845-47.

A third party has actual authority to consent to a search if she possesses common authority over the premises. *State v. Licari*, 659 N.W.2d 243, 250 (Minn. 2003). A common authority exists when there is "*mutual use* of the property by persons generally having *joint access or control for most purposes.*" *Id.* (quoting *United States v. Matlock*, 415 U.S. 164, 171 n.7, 94 S. Ct. 988, 993 n.7 (1974)). A minor child possesses authority to consent to a warrantless entry if the child resides on the premises and satisfies the mutual use and joint access or control elements. *Pesterfield v. Comm'r of Pub. Safety*, 399 N.W.2d 605, 609-10 (Minn. App. 1987); *State v. Lotton*, 527 N.W.2d 840, 845 (Minn. App. 1995), *review denied* (Minn. Apr. 18, 1995).

In *Lotton*, this court held that the district court erred by excluding evidence from a search when a 10-year-old opened her home's door and did not object to an officer following her in. 527 N.W.2d at 843. The child was familiar with police because her step-father was an officer and the officer who searched her residence was her D.A.R.E. instructor and a family friend. *Id.* Even though the officer never requested permission to enter, because the 10-year-old was intelligent and mature and her actions demonstrated an intent for the officers to enter, this court held that the consent was valid. *Id.* at 844.

In *Pesterfield*, a 17-year-old consented to an officer's entrance into her home to speak with her mother who was suspected of driving while intoxicated. 399 N.W.2d at

9

607. Although the minor eventually gave her consent, she was reluctant to allow the police entry and first called a neighbor to ask for advice. *Id.* at 609. The appellant claimed that the officers used a show of force and that the minor's consent was not voluntary under the circumstances. *Id.* This court held that "[w]hile the subject's knowledge of her right to refuse is a factor, establishing such knowledge is not a prerequisite to finding voluntary consent." *Id.*

Here, the officers informed E.K. why they wanted to search the home. E.K. resided in the home and therefore had joint access and control to the common living area where the Gamo was found. There is no indication that E.K.'s age affected her decision making. Sybrandt argues that E.K.'s consent was not voluntary because the police told E.K. to come outside where Sybrandt was in handcuffs, did not invite her to speak with an adult, and did not inform her she could refuse consent. But the officers were not required to allow E.K. to speak to an adult prior to consenting, nor were they required to inform her of her right to refuse consent. Based on the totality of the circumstances, Sybrandt has not shown the district court clearly erred in finding that E.K. gave valid consent. Because we conclude that consent provided a valid exception to the warrant requirement, we need not address the state's other arguments.

**Affirmed.**